## PASLEY v. UNION NAT. BANK OF BARTLESVILLE.

No. 18718.   Opinion Filed Oct. 9, 1928.

Rehearing Denied June 25, 1929.

J. M. Humphrey, for plaintiff in error.

M. E. Michaelson, for defendant in error.

Gray & Palmer, P. A. Shinn, and Humphrey & Spence, amici curiae.

DIFFENDAFFER, C. This is an action brought by defendant in error, hereinafter referred to as plaintiff, against plaintiff in error, hereinafter referred to as defendant, to recover upon a promissory note, negoti-

able in form, alleged to have been executed by defendant and one S. D. Pasley, on the 9th day of August, 1926, payable to the order of C. M. Keefer. The plaintiff alleged that, on or about September 1, 1926, and before the maturity of said note, it purchased the same from Keefer, whereby it became the owner and holder thereof in due course.

Defendant answered, setting up three defenses: First, a general denial; second, that the note was without consideration and obtained by Keefer by fraud, which facts were alleged to have been known by plaintiff, and that said note was not purchased by plaintiff in good faith, for value and before maturity; and the third defense is as follows:

"Comes now Rose Tinker Pasley, and further answering the petition of the plaintiff filed herein, says that she is a restricted Osage Indian, and that she is enrolled as Rose Tinker, Osage allottee No. 1976, roll No. 2112, and that said allottee is now and always has been under the direct supervision of the Secretary of the Interior.

"The defendant, Rose Tinker Pasley, alleges that said note attached to the petition of the plaintiff, and having been executed on the 9th day of August, 1926, is void, for the reason that it is a contract for debt, and that said contract has not been approved by the Secretary of the Interior, as required by the Act of Congress approved February 27, 1925, 43 Statutes at Large, p. 1007, which provides in section 6 thereof, that:

"'No contract for debt hereafter made with a member of the Osage Tribe of Indians, not having a certificate of competency, shall have any validity unless approved by the Secretary of the Interior.'

"The defendant alleges that she has not received a certificate of competency, and that said note is absolutely void against her in the hands of the alleged payee or the plaintiff in this action."

The plaintiff replied by general denial as to the first and second defense, and demurred to the third. The trial court sustain the demurrer and defendant declined to plead further. The court heard evidence as to the remaining issues, and entered judgment for plaintiff. From this judgment, defendant appeals. The appeal presents the single question: Did the court err in sustaining the demurrer to the third defense pleaded by defendant? If it was the intention of Congress, by the passage of section 6 of the Act of February 27, 1925, and particularly the first sentence thereof, to legislate only with reference to the restricted property of Osage Indians not hav-

ing received a certificate of competency, and not the intention of Congress to prohibit generally contracts for debt by such Indians, then the trial court was correct in sustaining the demurrer. But assuming that Congress did by section 6 of said act, and particularly the first sentences thereof, intend to prohibit or invalidate contracts for debt thereafter made with a member of the Osage Tribe of Indians not having a certificate of competency, in order to sustain the ruling of the trial court, we must hold that the provision in said act is unconstitutional.

Defendant cites many cases from this court and the Supreme Court of the United States upholding the power of Congress to legislate with reference to the lands and other property coming to an Indian by or on account of his membership in a particular tribe.

Plaintiff concedes the plenary legislative authority of Congress over the Osage Indian Tribe, their tribal affairs, tribal lands, tribal moneys, and over lands and money of the individual members of such tribe, allotted to or coming to such member through and because of their membership in such tribe. It is contended by plaintiff that, considering the Act of Congress of February 27, 1925, and the preceding acts of which it is amendatory, all together, no legislative intent is disclosed to interfere with the freedom of an Osage Indian to contract generally, but the restrictions imposed, and the contracts prohibited, cover only lands or moneys over which Congress has retained supervision and control. We cannot so construe the act. The language used is so plain and unambiguous as to forbid such construction. Congress said in plain words:

"No contract for debt hereafter made with a member of the Osage Tribe of Indians not having a certificate of competency, shall have any validity, unless approved by the Secretary of the Interior."

How can it be said that, in the use of language so plain, Congress intended to limit the inhibition to contracts for debt involving the property or funds of the individual Indian coming to him from tribal sources?

Our attention is called to Postoak v. Lee, 46 Okla. 477, 149 Pac. 155, in which the validity of a contract for the payment of an attorney's fee by a full-blood Choctaw Indian was under consideration, and wherein it was held:

"The restrictions against the right of full-blood Indians to contract are limited to contracts affecting their allotments."

The restriction on the right to contract in that case was that part of the Act of Congress of August 1, 1914, providing:

"Unless the consent of the United States shall have previously been given, all contracts made with any person, or persons, now or hereafter applicants for enrollment as citizens .in the Five Civilized Tribes for compensation for services in relation thereto, are hereby declared to be void and of no effect."

It was held that the provision did not apply, for the reason that, at the time the contract for attorney's fee was made, Postoak was not an applicant for enrollment, and, further, the contract had at the time the act was passed been merged into a judgment. The inhibition of that act only applied to persons who were then, or who might thereafter be, applicants · for enrollment in the Five Civilized Tribes, and the contract for compensation for services in relation thereto.

In 36 Cyc. 1106, the rule for construction of statutes is stated as follows:

"The great fundamental rule in construing statutes is to ascertain and give effect to the intention of the Legislature. This intention, however, must be the intention as expressed in the statute, and where the meaning of the language used is plain, it must be given effect by the courts, or they would be assuming legislative authority."

In Scott v. Brakel, 43 Okla. 655, 143 Pac. 510, this court, in the body of the opinion, said:

"The most elementary canon of construction is that where the meaning of the language used by the Legislature is plain, it must be given effect by the courts. Otherwise, say the authorities, the courts would be assuming legislative authority." Citing C., O. & G. R. R. Co. v. Alexander, 7 Okla. 591. 54 Pac. 421.

The argument of counsel for plaintiff is ingenious, and would be persuasive if there could be found any ambiguity in the language employed by Congress, but here it appears that the language is so clear that it cannot be restrained or extended, and we are therefore unable to construe the act so as to limit the inhibition to contracts for debt with a member of the Osage Indian Tribe, not having a certificate of competency, concerning or affecting only property or money coming to Indians as tribal property, or by reason of membership in the tribe.

Counsel for plaintiff says in his brief:

"Neither are we questioning the power of Congress to enact legislation affecting the capacity of an Osage Indian to contract generally. * * *"

But counsel amicus curiae earnestly contend that, though Congress did intend by the first sentence of section 6 of the act to invalidate or prohibit contracts for debt by Osage Indians, the provision violates both the federal and state Constitutions. Their contention is that Congress has no more authority to deprive Indians generally of the right to contract than it has to deprive whites, Japs, Chinese, or any other people of that right. That is perhaps true where the Indians are in the same relation as whites.

The question to be determined is: Has Congress the power to declare a contract for debt entered into by a member of the Osage Indian Tribe, not having a certificate of competency, invalid, unless approved by the Secretary of the Interior?

It is confidently asserted that never at any other time has Congress undertook to deprive any Indian tribe, or any Indian in America, of the right to contract. Many cases are cited holding that the right to contract about one's affairs is a part of the *liberty of the individual protected by the due* process clause of the Fifth Amendment to the Constitution of the United States. Such was the holding in Atkins v. Children's Hospital, 261 U. S. 525, 67 L. Ed. 785. Many cases are therein cited in support of the rule. In Coppage v. United States, 236 U. S. 14, 59 L. Ed. 446, it was said:

"Included in the right of personal liberty and the right of private property—partaking of the nature of each—is the right to make contracts for the acquisition of property."

And further:

"An interference with this liberty so serious as that now under consideration, and so disturbing of equality of right, must be deemed to be arbitrary; unless it be supportable as a reasonable exercise of the police power of the state."

In Atkins v. Children's Hospital, supra, the court said:

"There is, of course, no such thing as absolute freedom of contract. It is subject to a great variety of restraints. But freedom of contract is, nevertheless, the general rule and restraint the exception; and the exercise of legislative authority to abridge it can be justified only by the existence of exceptional circumstances."

The court there reviews a number of de-

cisions where the interference was upheld, and places them in four classes: (1) Those cases dealing with statutes fixing rates and charges to be exacted by businesses impressed with a public interest. (2) Statutes relating to contracts for the performance of public works. (3) Statutes prescribing the character, method and time for payment of wages. (4) Statutes fixing hours of labor, same being for men in certain occupations, such as an act of the Utah Legislature restricting the hours of labor in mines and smelters. The latter statute was sustained as a legitimate exercise of the police power, on the ground that the Legislature of the state had determined that these particular employments, when too long pursued, were injurious to the health of the employees, and as there were reasonable grounds for supporting this determination, its decision in that respect was beyond the reviewing power of the federal courts. See Holden v. Hardy, 169 U. S. 366, 18 Sup. Ct. 383. It is pointed out that the first class of statutes has been upheld, upon the ground that, where property is devoted to public use, the owner thereof, in effect, grants to the public an interest in the case which may be controlled by the public for the common good to the extent of the interest created. It is further pointed out that the second class of statutes has been sustained, not upon the right to condition private contracts, but upon the right of the government to prescribe the condition upon which it will permit work of a public character to be done for it, or in the case of a state, for its municipalities.

The third class of statutes, those prescribing the character and time of payment of wages, has been sustained, not because they can be said to be a precedent for wage-fixing statutes, but because their tendency, and evident purpose, was to prevent unfair and perhaps fraudulent methods in payment of wages.

It will thus be seen that there are at least four well-recognized exceptions to the rule that the right of personal liberty includes the right of freedom to contract. To these four classes of statutes may be added that class which restricts the right of Indians to contract, with reference to control and disposition of their property coming to them by, or because of, their membership in an Indian tribe. The validity of this class of statutes is conceded by all. There is another class which we think is applicable here; that is, those statutes which forbid certain contracts with Indians not involving the control or disposition of tribal prop-

erty, such as the sale of liquor to Indians, who are wards of the United States, and others' restricting or prohibiting contracts for debt in excess of certain percentages of qarterly alowances payable to such Indians. (Act of March 3, 1901.)

The grounds upon which the statute here under consideration is assailed are that it interferes with the freedom of the Indian to contract, and that Osage Indians, being citizens of the United States, are entitled to that same freedom to contract that any other citizen enjoys. In Re Heff, 197 U. S. 488, 49 L. Ed. 848, the constitutionality of the Act of January 30, 1897, penalizing the sale of intoxicating liquor to Indians in certain cases, was attacked as applied to a sale to an Indian who had become a citizen of the United States, and it was there held:

"Congress was not given the power, by the commerce clause of the federal Constitution, to penalize by the Act of January 30, 1897 (29 Stat. at L. 506, chap. 109), the sale of liquor within a state to an Indian to whom an allotment had been made under the Act of February 8, 1887, which grants the allottees the privilege of citizenship, and gives them the benefit of, and requires them to be subject to, the civil and criminal laws of the state where they reside; since this emancipation from federal control is not affected by the fact that the statute provides that the Indian title shall not be alienated or incumbered for 25 years, when a final patent shall issue, and stipulates that the grant of citizenship shall not impair their right to tribal or other property."

But in U. S. v. Nice, 241 U. S. 591, 60 L. Ed. 1192, the case In re Heff, supra, was expressly overruled, and it was therein said:

"The power of Congress to regulate or prohibit traffic in intoxicating liquor with tribal Indians within a state, whether upon or off an Indian reservation, is well settled. It has long been exercised, and has repeatedly been sustained by this court. Its source is twofold; first, the clause in the Constitution expressly investing Congress with authority 'to regulate commerce * * * with the Indian tribes;' and second, the dependent relation of such tribes to the United States"

—and further:

"Of course, when the Indians are prepared to exercise the privileges and bear the burdens of one sui juris, the tribal relation may be dissolved, and the national guardianship brought to an end, but it rests with Congress to determine when and how this shall be done, and whether the emancipation shall at first be complete or only partial. Citizenship is not incompatible with tribal existence or continued guardianship, and so may be con-

ferred without completely emancipating the Indians, or placing them beyond the reach of congressional regulations aodpted for their protection."

. It will b'e observed that the power to thus restrict the right of contract was based: First, upon the clause in the Constitution expressly investing Congress with authority "to regulate commerce * * * with the Indian tribes;" and second, th'e dependent relation of such tribes to the United States. If, under the clause of the Constitution expressly investing Congress with power to regulate commerce with the Indians, Congress may restrict the Indian in the right to contract, after becoming a citizen, in matters involving the purchase of intoxicating liquor, which at that time any other citizen might freely do, where is th'ere room for saying that, under the same clause, Congress may not restrict the right of contract in such Indians in other matters of commerce? These Osage Indians who have not received a certificate of competency are still wards of the government. That the government has the power to so declare th'em is not, and cannot be, questioned. They being wards of the government, and Congress being vested with plenary power to legislate for them and in their behalf, we think it follows that Congress would have the right to say to what extent, or for what purposes, and under what conditions, the wards of the government might become ind'ebted.

The power of the state to impose restrictions and conditions upon the right of its citizens, who sustain the relation of wards to the state, to contract, has nev'er been questioned. By statute it is usually provided that minors and persons of unsound mind have only such capacity to contract as is defined by the statute of the state. The power of th'e state to declare that a minor cannot give a delegation of power, nor, under a certain age, make any contract relating to real estate, or any interest therein, or relating to personal property not in his immediate possession or control, or prescribing conditions under which such contracts may be made, is generally recognized, and this without regard to whether or not such minor be a citizen of the United States.

We, therefore, hold that the statute in question does not violate the Constitution.

The plaintiff by its demurrer admits that defendant is an Osage Indian, enrolled as such; that she has not received a certificate of competency, and that the note was executed after the 27th day of February, 1925,

and that th'e contract or note had not been approved by the Secretary of the Interior. Having concluded that the first sentence of section 6 of the Act of February 27, 1925, does not violate the Constitution of th'e United States, we hold that the trial court erred in sustaining the demurrer to the defendant's third defense.

The judgment should be revers'ed, and the cause remanded, with directions to grant the defendant a new trial, and to overrule the demurrer.

BENNETT, TEEHEE, HERR, and HALL, Commissioners, concur.

By the Court: It is so ordered.

Note.—See under (1) 36 Cyc. p. 1107. (2) 31 C. J. 483, § 11. See "Indians," 31 C. J., § 11, p. 483, n. 66. "Statutes," 36 Cyc. p. 1107, n. 31.