CITIES SERVICE GAS CO. v. PEERLESS OIL & GAS CO. et al.
PHILLIPS PETROLEUM CO. v. STATE et al.

Nos. 32994, 33006.   Jan. 17, 1950.

Rehearing Denied March 21, 1950.

*220 P. 2d 279.*

Glenn W. Clark, R. E. Cullison, and Joe Rolston, Jr., all of Oklahoma City, for plaintiff in error Cities Service Gas Company.

Don Emery, Rayburn L. Foster, R. B. F. Hummer, all of Bartlesville, Harry D. Turner and R. M. Williams, all of Oklahoma City, for plaintiff in error Phillips Petroleum Company.

Earl Pruet, of Oklahoma City (Richardson, Shartel, Cochran & Pruet, of Oklahoma City, of counsel), for defendants in error Peerless Oil & Gas Company and Texas County Land Royalty Owners Association.

Mac Q. Williamson, Atty. Gen., and Floyd Green, Earl Pruet, and W. D. McBee, for defendants in error.

Floyd Green, John Blanton, and Charles F. White, for State of Oklahoma.

W. D. McBee, of Oklahoma City, for Commissioners of the Land Office.

T. Murray Robinson (Robinson, Shipp & Robertson, of counsel) amicus curiae.

WELCH, J. Peerless Oil & Gas Company, owner of a gas well and certain oil and gas leases on lands located in the Guymon-Hugoton Gas Field in Texas county, filed with the Corporation Commission an application for an order requiring Cities Service Gas Company to connect its pipeline to the gas well and take and receive the natural flow of gas from the well ratably with its taking of gas from other wells of the field, and further that the Commission fix the price at which said gas should be taken and fix the price for all natural gas produced in the Guymon-Hugoton Gas Field in Oklahoma. Peerless alleged drainage by Cities Service and failure of agreement with Cities Service for the taking of gas from its well, and particularly a disagreement as to the price for the gas.

Cities Service filed answer admitting its ownership of a pipeline system and that it was taking gas from the field through its lines and stated an offer to take gas from the Peerless wells ratably with its taking of gas from other wells in the field and at the average price paid for gas in the field. Cities Service alleged a usage of its pipeline in the furtherance of a business of producing natural gas for transportation and sale in interstate commerce and asserted that the Corporation Commission was without power or authority to regulate its facility and business, and, particularly, to order the price and terms for taking or purchasing gas in the field.

After hearing of the Peerless application had commenced the Corporation Commission permitted the State of Oklahoma, on relation of the Commissioners of the Land Office, to file petition in intervention. The Land Office alleged ownership in trust for the state of a large acreage of land in the gas field and surrounding areas. It asserted that monopolistic price and arbitrary measurements for gas prevailed in the field, and was resulting in dissipation and exhaustion of gas from the common source of supply at a fraction of its intrinsic value, and that such taking was resulting in wanton economic waste. The Land Office prayed that the Corporation Commission fix a minimum price and a certain standard of measurement applicable to all gas in the field and to be applied upon its removal from the natural reservoir.

The Commission published notice of the time and place of a hearing to be held upon the Land Office petition, with invitation to all persons interested to appear and be heard. The notices were directed to certain named companies and to "all operators, purchasers, and takers of gas in Oklahoma, and particularly in Guymon-Hugoton Field in Texas County, Oklahoma."

In the course of the proceeding a petition was filed requesting the Commission to fix a minimum price for gas in the field signed by several persons as royalty owners and under a designation as members of the Texas County Land and Royalty Owners' Association.

The Commission, after the series of hearings above mentioned, and after hearing testimony from witnesses presented by Peerless, the Land Office, Cities Service, and the testimony of various other persons, entered a general order that on and after a certain future date, therein mentioned, "no natural gas shall be taken out of the producing structures or formations in the Guymon-Hugoton Field in Texas County, Oklahoma, at a price at the wellhead of less than 7c per thousand cubic feet of natural gas measured at a pressure of 14.65 pounds absolute pressure per square inch." The Commission issued a further order to become effective on the same date directed to Cities Service ordering that Company to take gas from the Peerless wells ratably with its taking from other wells in the field and as ratable taking is prescribed in a certain former gen-

eral order of the Commission, and that Cities Service pay the Peerless for the gas so taken not less than 7c per thousand cubic feet wellhead price measured at a pressure of 14.16 pounds pressure per square inch.

Subsequent to the effective date of these orders Phillips Petroleum Company filed an application to vacate or modify the price fixing provision of the orders. After a hearing wherein evidence was introduced, the Commission entered an order denying the application to vacate.

Cities Service appeals from the two price-fixing orders. Phillips appeals from these orders and from the order denying its application to vacate.

During the pendency of the Peerless application, Peerless and Cities Service entered into an agreement for a ratable taking of gas from the Peerless wells by Cities Service, leaving unsettled the price to be paid for the gas.

The primary question presented in these appeals arises from the order of the Commission fixing a minimum price on natural gas in the field.

Cities Service presents argument under the following statements:

"1. No constitutional or statutory power is granted Commission, either expressly or by necessary implication, to fix by general order the price or other terms for taking or purchasing natural gas in the field.

"2. 52 O. S. 1941 §233, purporting to authorize Commission in case of dispute to fix price and other terms for taking or purchasing natural gas as between individual parties, is unconstitutional because:

(a) It sets forth no policy or standard to guide Commission in acting thereunder (Articles IV and V. Oklahoma Constitution):

(b) It violates the equal protection clause of the Federal Constitution (Section 1, Article XIV, U. S. Constitution);

.and

(c) It violates the due process clauses of the Oklahoma and Federal Constitution (Section 7, Article II, and 14th Amendment; as well as Sections 2 and 23, Article II, Oklahoma Constitution, and Section 59, Article V, Oklahoma Constitution.)

"3. If this Court should hold Commission under existing law is either expressly or impliedly granted natural gas price-fixing powers under some conceivable circumstances, the same are unconstitutional as applied herein because:

(a) Price fixing has no reasonable relationship to waste, protection of correlative rights, or conservation of natural resources;

(b) It casts a burden on, impedes and impairs interstate commerce in violation of the commerce clause of the Federal Constitution (Clause 3, Section 8, Article 1); and

(c) It denies Cities due process and the equal protection of the law (14th Amendment, Oklahoma Constitution).

"4. If this Court should hold Commission is under present laws granted constitutional or statutory price-fixing powers, then existing laws are not self-executing but require Commission, in advance of an attempt on its part to enforce the taking or purchasing of natural gas, to specify with clarity and particularity the elements constituting the basis of such taking or purchasing so as to enable the parties concerned to effectuate fully and fairly a completed contract.

"5. If this Court should hold Commission is granted under present laws constitutional and statutory price-fixing powers and existing laws are self-executing, then Commission in exercising its authority thereunder is confined to ascertaining and applying the going or market price and other non-discriminatory equitable terms for taking or purchasing natural gas prevailing in the field.

"6. The orders of the Commission are void because of vagueness, indefiniteness, and uncertainty.

"7. Commission erred in denying Cities' motions and demurrers; (a) Motion to allow inspection and copy of certain records and documents of Peerless material to judicial phase of case;

(b) Demurrer, motion to dismiss, and motion for judgment in judicial phase of the case;

(c) Combined demurrer, motion to dismiss, and motion for judgment in the legislative phase of the case;

(d) Motion to set aside findings of fact and conclusions of laws in order entered by Commission in judicial phase of the case and substitute therefor certain findings of fact and conclusions of law submitted by Cities and for judgment;

(e) Motion for new trial in judicial phase of the case.

"8. The findings and orders of Commission are not supported by substantial, competent evidence and are contrary to the undisputed evidence.

"9. Commission failed to grant Cities a fair and impartial trial and hearing in accordance with the due process clauses of the Oklahoma and Federal Constitutions (Section 7, Article II, Bill of Rights, Oklahoma Constitution; Section 1, Article XIV, U. S. Constitution;

(a) By refusing to inform Cities in advance of the trial of the case what rules of practice and procedure would be applied by Commission at the hearing thereof;

(b) By allowing the misjoinder of judicial and legislative matters;

(c) By erroneously consolidating judicial and legislative matters;

(d) By erroneously allowing Land Office to file petition in intervention and intervene in the case;

(e) By allowing a private citizen to make a statement and speech to the Commission during the course of the trial;

(f) By conducting a plebiscite of land and royalty owners while case was in hearing;

(g) By filing petitions with Federal Power Commission while trial was in progress stating Commission was interested in increasing price of natural gas;

(h) By allowing Commission's conservation attorney to participate and take an active part in trial of private dispute between Peerless and Cities;

(i) By admitting incompetent and hearsay evidence and testimony;

(j) By refusing to segregate and seperate the evidence of Peerless, Land Office and others at the close of their testimony so Cities could know what evidence pertained to the judicial phase of the case and what evidence pertained to the legislative phase of the case;

(k) By Commission's refusing to recognize, apply, and abide by its own subsisting orders."

Since 1913, Laws 1913, ch. 198, secs. 1, 2, 3, 52 O.S. 1941 §§231, 232, 233, the statutes of this state have provided that owners might take, from a common source, amounts of gas proportionate to the natural flow of their respective wells, but not more than 25% of that natural flow without consent of the Corporation Commission; that any person taking gas from a gas field, except for certain specified purposes, "shall take ratably from each owner of the gas in proportion to his interest in said gas, upon such terms as may be agreed upon between said owners and the party taking such, or in case they cannot agree at such a price and upon such terms as may be fixed by the Corporation Commission. . . ."

Obviously, the protection of the interest of all owners of the gas is the intent of the statute and such is the standard of guidance to the Corporation Commission acting thereunder.

Various types of state regulatory schemes providing for ratable taking and designed to protect the "coequal rights" of the several owners of com-

mon source of supply have been sustained. Ohio Oil Co. v. Indiana, 177 U. S. 190, 44 L. Ed. 729, 20 S. Ct. 576; Bandini Petr. Co. v. Superior Ct., 284 U. S. 8, 76 L. Ed. 136, 52 S. Ct. 103, 78 A. L. R. 826; Patterson v. Stanolind Oil & Gas Co., 182 Okla. 155, 77 P. 2d 83; Patterson v. Stanolind Co., 305 U. S. 376, 83 L. Ed. 231, 59 S. Ct. 259. In Republic Natural Gas Co. v. State et al., 198 Okla. 350, 180 P. 2d 1009, an order of such an effect by the Corporation Commission was sustained.

In reference to provisions of section 233, supra, and an order of the Corporation Commission made pursuant thereto requiring producer of gas to take ratably from well of another producer in the field, it was held that a foreign corporation obtaining permission to do business and produce natural gas in this state may not question constitutionality of the statute. The decision of this court affirming the Commission was appealed to the United States Supreme Court. Republic Natural Gas Co. v. State et al., 334 U. S. 62, 92 L. Ed. 1212. That court held, in an opinion by Justice Frankfurter, that by reason of matters left open by the Commission's order, this court's judgment lacked the finality requisite to a review there. In the majority opinion reference is made to the order of the Commission as going no further than to require ratable taking of gas and the probability that the Commission will be later asked to determine specific terms of the taking including the price to be paid for the gas. Reference is made to price-fixing as being inherently provocative of constitutional claims and to the probability of additional federal question arising out of the controversy. Four members of the court joined in dissent. In a dissenting opinion by Justice Rutledge containing a discussion of the case on the merits, it is said:

" . . . In a line of cases beginning a half century ago with Ohio Oil Co. v. Indiana, 177 U. S. 190, 44 L. Ed. 729,

20 S. Ct. 575, this Court has upheld various types of state regulatory schemes designed to prevent waste and to protect the 'coequal rights' of the several owners of a common source of supply. Those cases clearly recognize that the state regulation may be justified on alternative grounds, either to prevent waste or to adjust private correlative rights."

After stating a conclusion that a state may require ratable taking in the preservation of correlative rights in a common source of supply, it was further said:

"The remaining narrow issue is whether the most practical method of achieving a fair accommodation of the correlative rights of the parties is invalid because Republic is required to take and to pay for gas that it does not want—at least does not want if it must pay for it. . . .

"The fact that Republic is compelled either to purchase Peerless' gas or to carry it to market and account for the profits does not make the regulation unreasonable. If that were the sole cause for complaint, the state could take the more drastic step of requiring all the well owners to shut down completely until all were able to produce on a ratable basis or came to some agreement effective to make this possible. It is clearly within the state's power to require Republic to compensate Peerless for the gas drained from under the Peerless land. Patterson v. Stanolind Oil & Gas Co., 305 U.S. 376, 83 L. Ed. 231, 59 S. Ct. 259. Here, instead of requiring Republic to make a cash payment based on the estimated amount of drainage, the commission has selected what is unquestionably a more accurate method of adjusting the correlative rights. Even if it could be assumed that this method imposed a somewhat heavier burden on Republic than possible alternatives, it does not follow that the method selected by the Commission is unconstitutional. For we have constantly recognized the propriety of allowing wide discretion to the administrative agencies who are best qualified to select the most reasonable solutions to the thorny problems that accompany

regulation in this highly technical field. Railroad Commission v. Rowan & N. Oil Co., 310 U. S. 573, 84 L. Ed. 1368, 60 S. Ct. 1021. Keeping in mind the fact that property law is peculiarly a matter of local concern, the special difficulty of defining and regulating property rights in natural gas, the respect due to experts in this field, and the rather unusual facts this record presents, I cannot say that the state is without power to enter this order.

"It is suggested that the order, since it includes the requirement of purchase and not merely of transportation and accounting for profits, becomes invalid because it shifts from Peerless to Republic the business risk incident to ownership and sale of the gas. Possibly this might furnish a more serious basis for objection in materially different circumstances. But, apart from what has already been said, in those now presented I conceive no substantially greater harm to be possible from the order's operation, than depriving Republic of the rights to drain gas from beneath Peerless' lease without liability to pay for the gas so drained.

"This assumes that if the parties should be unable to agree upon terms the commission will fix them in a manner taking due account of prevailing market conditions relevant to the price to be paid, as well as reasonable compensation for the use of Republic's facilities. With those limitations properly applied, it is hard to see what great business risk will be shifted to Republic. For, as we have already noted, the commodity is one not subject to storage, must be sold as soon as it is transported to the point of consumption, and therefore cannot be subject to possible wide fluctuation in selling price between the times of purchase and sale by Republic."

We think it clear that the due process and equal protection provisions of the Federal and State Constitutions do not preclude the state, in the exercise of its power to preserve the correlative rights of producers of natural gas from a common pool, from requiring one either to shut down its wells or take ratably from the other producer who has no outlet under such terms as the parties may agree upon; or in default of agreement, to take upon such terms and price as may be fixed by the Corporation Commission consistent with equality in returns for gas taken in the field. Such device is but a practical or feasible alternative consistent with production by both to protect the one from drainage by the other.

The Commission's order, made under the provisions of section 233, supra, directing that Cities Service as a condition of its further taking of gas from the field, should take ratably from the wells of Peerless, is readily sustainable. The portion of the order directing payment for the gas so taken at not less than 7c per thousand cubic feet at the wellhead rests upon the Commission's general order prohibiting the taking of gas from the producing structures or formations in the field for a price at the wellhead of less than 7c per thousand cubic feet.

In 1915 provision was made for regulation of the extraction of natural gas, not only to prevent excessive drainage as between producers, but for the prevention of waste and for the protection of the interest of the public and the interest of all those having a right to take from a common reservoir.

It was provided, Laws 1915, ch. 197, §4, 52 O. S. 1941 §239, that when the full production from a common source of supply of natural gas is in excess of the market demands, a producer from such common source of supply may take therefrom only such proportion as may be marketed without waste, and in such proportion as the natural flow of the well or wells of such producer bears to the total natural flow of the field, having due regard to the acreage drained by each well; provided that the Corporation Commission may permit the taking of a greater amount whenever it shall deem such taking reasonable or equitable. The statute provides that "the said commission is authorized and directed . . . to regulate the taking of natural gas from any or all such common sources of supply within the state, so as to prevent waste, protect the

interests of the public, and of all those having a right to produce therefrom, and to prevent unreasonable discrimination in favor of any one such common source of supply as against another."

The succeeding section 240 provided as follows:

"Every person, firm or corporation, now or hereafter engaged in the business of purchasing and selling natural gas in this state, shall be a common purchaser thereof, and shall purchase all of the natural gas which may be offered for sale, and which may reasonably be reached by its trunk lines, or gathering lines without discrimination in favor of one producer as against another, or in favor of any one source of supply as against another save as authorized by the Corporation Commission after due notice and hearing; but if any such person, firm or corporation, shall be unable to purchase all the gas so offered, then it shall purchase natural gas from each producer ratably. It shall be unlawful for any such common purchaser to discriminate between like grades and pressures of natural gas, or in favor of its own production, or of production in which it may be directly or indirectly interested, either in whole or in part, but for the purpose of prorating the natural gas to be marketed, such production shall be treated in like manner as that of any other producer or person, and shall be taken only in the ratable proportion that such production bears to the total production available for marketing. The Corporation Commission shall have authority to make regulations for the delivery, metering and equitable purchasing and taking of all such gas and shall have authority to relieve any such common purchaser, after due notice and hearing, from the duty of purchasing gas of an inferior quality or grade. (Laws 1915, ch. 197, sec. 5)"

Obviously the impelling reason for discrimination in the taking of gas from one source of supply as against another rests in economic consideration, and it is obvious that a practical and ready means of preventing such discrimination appears with control of the price of gas at its original source, or at the "wellhead" in each of the particular fields. Reference to protection of the interest of all those having a right to produce gas from a common source of supply directs attention to the owners of the land overlying the gas and such interests as they have conveyed. Doubtless because of the technical and financial requirements in taking gas from its natural place, it has long been the general practice of landowners to lease the privilege of taking gas from under their lands and usually in consideration of a royalty of 1/8th or a particular part of the gas so taken or its equivalent marketed. Because of such technical and financial requirements in the development of a gas field, and necessary to the marketing and commercial use of gas, landowners are usually compelled to enter into such leasing arrangements as the only means of securing an exploration and development of their gas resources. In the very nature of the product, landowners cannot accept delivery of gas so produced but must trust to producers for a proper handling of their share of the production. Such reserved or royalty interests are transferable and oft-times are sold in whole or in part.

As suggested by Justice Rutledge in Republic Nat. Gas Co. v. State, supra:

" . . . Natural gas in place is volatile and fugitive, once a single outlet is opened. When extracted it cannot be stored in quantity, but must be marketed ultimately at burner tips in the time necessary for conveyance to them from the well mouth. The competitive struggle for the industry's rewards is particularly intense in the initial stage of developing a field. By the industry's very nature large outlays of capital are required for successful continuing production and marketing. All those factors, however, tend toward monopoly once success has been achieved in a particular field.

"These peculiar qualities, moreover, have been reflected in the legal rights relating to the ownership of gas in place, as well as its extraction. They have been adapted to its nature and to

that of the competitive struggle regarding it. Only a specialist in this branch of the law, which varies from state to state, can undertake to say with any reliable degree of precision what rights may be in particular situations. These difficulties, intensified by the competitive struggle for the product and the inadequacy of common-law ideas to control it, have forced both the states and the federal government to adopt extensive regulatory measures in recent years. This has been necessary both to conserve the public interest in this rapidly depleting natural resource and to secure fair adjustment of private rights in the industry. Rather than being a sacred, untouchable enclave of the common law, the field by its very nature lends itself especially to governmental intervention for such purposes. . . ."

It is readily conceivable that in the course of development of a particular gas field, the ownership of producing and marketing facilities might become such, or be so combined, as to permit monopolistic practices. Under the circumstances prices for gas might be established having no relation to the market value of gas prevailing throughout the natural gas industry, and in other fields of commensurate development costs, and having no relation to the market value of other natural resources and products in competitive usage. On the other hand, a like result might obtain from economic warfare between competing producers and marketers. Under either of such circumstances, prices might be so reduced that landowners or royalty holders or particular leaseholders would have their interests in the gas exhausted, dissipated and taken, without having received any reasonable compensation, and each suffer waste of a valuable reversion.

Likewise, the taking of gas under such circumstances would be inimical to the public interest. Like other natural resource, the subject of private ownership and exploitation, natural gas is a taxable resource. The tax is applied to the gross production and finally measured by the market value or price of the thing produced or reduced to personal possession. The taking of gas from a field, when the taking price of the gas is substantially lower than the price prevailing in other gas fields having commensurate production costs, and at prices having no relation to the market value of other of the natural resources of competitive usage, leads to an exhaustion of such gas without it having borne its fair share of taxation.

Natural gas being exhaustible and of various valuable usage, the public interest extends to its conservation. Undoubtedly the price at which gas may be obtained has an influence upon the ultimate purpose for which gas may be taken and used, and when the price for gas is substantially lower than its intrinsic value or lower than the market price of products of similar usage, a wasteful use of the gas is apt to occur.

The relationship of price to conservation is suggested in the following expression from the concluding paragraph of the opinion in Quinton Relief Oil & Gas Co. v. Corporation Commission, 101 Okla. 164, 224 P. 156:

" . . . Natural gas has twice the heating units as artificial gas, and taking into consideration the convenience of natural gas, it is intrinsically worth more than artificial gas; its market value being from $2 to $3 per 1,000 cubic feet. The amount of carbon black produced from 1,000 cubic feet of natural gas has a market value of about 10 cents. It, therefore, is obvious that the state, in the proper exercise of its police power and in conservation of so valuable a natural resource as natural gas, may prohibit the wasteful utilization of the same in the interest of the public welfare."

The impelling reason for or cause of discrimination in the taking of gas from one source of supply as against another, and the dilemma of the landowner growing out of private contract for the sale of gas without his interest being represented, is suggested in the

44

following expression found in Oklahoma Natural Gas Corp. v. State et al., 161 Okla. 104, 17 P. 2d 488:

"It would be a very efficient scheme to circumvent the proration law for a purchaser of gas operating by pipeline, which it has to have in order to successfully handle gas, to take more gas in one place on a low cost than a rival operating on a higher purchase cost depending on contract, and by a system of reciprocity, allow its competitor in another pool to take more on the cheap rate. Thus it would be to the advantage of the friendly pipelines, and very much to the disadvantage of the unsuspecting landowner. Hence the necessity for putting somewhere the power to get a check upon this and as far as possible prevent it and equalize."

We are of the opinion that such considerations as above discussed occupied the legislative mind and motivated the enactment of the 1915 Act. In the 1915 Act the grant of power to the Corporation Commission to regulate the taking of natural gas from any source of supply, so as to protect the interest of all those having a right to produce therefrom, by necessary implication, includes the power to fix a minimum price on the gas as a condition of the taking, when found reasonably necessary to the accomplishment of that purpose. Likewise the grant of power to regulate, with directions that such power be exercised so as to prevent waste and protect the interest of the public, necessarily implies a power to fix prices as a condition of the taking of gas when otherwise, and because of prevailing prices, the public interest might suffer.

It is well settled that the state in exercise of its police power may regulate the taking of natural gas in the protection of the public interest and in preservation of private correlative rights. Quinton Relief Oil & Gas Co. v. Corp. Comm., supra; Patterson v. Stanolind Oil & Gas Co., 182 Okla. 155, 77 P. 2d 83, and Republic Natural Gas Co. v. State, supra.

Such policy of the law-making body of the state is expressed in the 1915 act. In the nature of the subject matter the Legislature was compelled to leave to another agency of the state the duty of bringing about the result pointed out by the statute. As has been noted, under section 239, supra, the Commission is charged with the duty of regulating the taking of gas from a common source of supply. The standard to guide the Commission in acting thereunder is the prevention of waste, the protection of the interest of the public, and the protection of the interest of all those having a right to produce from such common source of supply. There is no invalid delegation of power by reason of uncertainty in the stated criterion and the act does not confer arbitrary and uncontrolled powers. The price-fixing feature of the Commission's order is but a means of securing the purpose for which the act was passed, or is the instrumentality employed by the Commission to carry out the legislative will and it is limited in its use to the effecting of the expressed purpose. The validity of the order rests in its reasonableness and relevancy to the policy the Legislature was free to adopt.

As was stated in Nebbia v. New York, 291 U. S. 502, 78 L. Ed 940:

"Price control, like any other form of regulation, is unconstitutional only if arbitrary, discriminatory, or demonstrably irrelevant to the policy the Legislature is free to adopt, and hence an unnecessary and unwarranted interference with individual liberty."

See Herrin v. Arnold, 183 Okla. 392, 82 P. 2d 977.

The Commission had before it the sworn testimony of persons who stated they were engineers of long experience in the production and marketing of natural gas. These witnesses gave testimony to the effect that studies had been made of the character of the natural gas in the Guymon-Hugoton Field, and that studies had been made of the

intrinsic value of natural gas or the value of gas as compared to the market value of other fuels in the relation to the heat units each would produce. With these factors considered, it was stated that the commercial heat value of the gas in the Guymon-Hugoton Field, tested with consideration to its delivery and sale at a certain central point of commercial usage, and with subtraction of nominal transportation costs to such central point of commercial usage, is in excess of 10c per 1,000 cubic feet. It was stated that large blocks of acreage in the Guymon-Hugoton Field are under lease to a comparatively few companies who own the only pipe line outlets from the field, and that competition in the price of gas is not an element in the taking of gas in the field; that the gas is being taken from the field at prices at the wellhead ranging from 3.6c to 5c per 1,000 cubic feet measured on a basis of 2 pounds pressure per square inch above atmospheric pressure; that gas is being taken from the field and sold away from the field under unit of measurement of less than 2 pounds above atmospheric pressure. Various opinions were expressed by these witnesses who related long records of experience in the gas industry. It was stated that taking of gas from the field at prices of 3.6c to 5c per 1,000 cubic feet constituted economic waste and that such prices were conducive of physical waste and that to prevent economic and physical waste the minimum price for gas in the field should be 10c per 1,000 cubic feet.

An employee of the State School Land Commission gave testimony to the effect that the state owned 49,600 acres of land located in Texas county, 30,160 acres of which was under lease with 6,099.92 acres being held as producing leaseholds; that the Land Office was receiving royalty from such productions on the basis of 4c per 1,000 cubic feet for gas at the wellhead, and in some instances on the basis of 5c at the wellhead and that one producer from a large acreage was offering to pay 3.34 cents.

The testimony abundantly supports a conclusion that the conditions under which gas is being taken from the field is injurious to the interest of the public at large, and inimical to the interest of a substantial group such as landowners and others and is resulting in economic waste and conducive to physical waste. The testimony demonstrates that the price fixed as a condition of the further taking of gas from the field is reasonable and not beyond the requirements of the situation sought to be corrected, and will not result in discrimination.

The Corporation Commission has heretofore exercised its power of fixing prices at which natural gas may be produced and taken. As early as 1920, after the prescribed notice and hearing, the Commission fixed the price of 9c per M.C.F. for gas in the Cushing field. And in 1944, acting specifically in view of the national emergency, the Commission, after notice and hearing, authorized the taking of natural gas for the manufacture of carbon black, but fixed the price to be paid for the gas so produced and used. And it was specified that the continued effectiveness of the permit should depend on the maintaining of the fixed price.

In this connection we observe the following demonstrations of a well-known rule of construction. In Foot v. Town of Watonga, 37 Okla. 43, 130 P. 597 (598), this court said:

"The construction placed on statutes or constitutional provisions by officers in the discharge of their duties, either at or near the time of the enactment, which has been long acquiesced in, is a just medium for their judicial interpretation."

And in Newblock v. Bowles, 170 Okla. 487, 40 P. 2d 1097, (1101), this court said:

"In McCain v. State Election Board et al., 144 Okla. 85, 289 P. 759, 760, this court held: 'The construction which

has been placed upon a statute by the officer or governmental department charged with the carrying out of the provisions of the law is to be accorded due consideration by the courts in construing the statute.' To the same effect is the holding of this court in Leininger et al. v. Ward-Beekman & Brooks, Inc., 139 Okla. 292, 282 P. 467; Glasco v. State Election Board et al., 121 Okla. 119, 248 P. 642; Foot et al. v. Town of Watonga, 37 Okla. 43, 130 P. 597."

And in Washington County v. State Tax Commission, 103 Utah, 73, 133 P. 2d 564 (568), this court said:

" 'It is a general rule that contemporaneous construction by the department of government specifically delegated to carry out a provision of the Constitution raises a strong presumption that such construction, if uniform and long acquiesced in, rightly interprets the provision. . . . While such construction is not conclusive upon the courts, it is entitled to the most respectful consideration.' Wells Fargo & Co. v. Harrington, 54 Mont. 235, 169 P. 463, 466."

See, also, League v. Town of Taloga, 35 Okla. 277, 129 P. 702; Williams v. Continental Construction Co., 168 Okla. 510, 34 P. 2d 254.

In Great Northern Life Insurance Co. v. Read, 136 Fed. 2d 44, in construing a statute of Oklahoma, the 10th Circuit Court of Appeals said:

"It is clear, under the Oklahoma statutes, that the license of a foreign insurance company expires on the last day of February next after its issue. Art. XIX of the Oklahoma Constitution and the Oklahoma statutes, hereinabove referred to, permit of the construction that the payment of the gross premiums tax on or before the expiration of the license year on the last day of February is exacted for the privilege of doing business in the state during that license year and as a condition precedent to the issuance of a license for the ensuing year. Such has been the uniform and long-continued construction of the executive department charged with the administration of the statutes. The long-continued construction of a

statute by a department of the government charged with its execution is entitled to great weight and should not be overturned without cogent reasons. The Legislature of Oklahoma has convened many times during this period of administrative construction without expressing its disapproval. That silence may be regarded as acquiescence in or approval of the administrative construction. Similar statutory provisions have been so construed."

Cities Service contends the order appealed from impedes and impairs interstate commerce in violation of the commerce clause of the Federal Constitution. In Interstate Natural Gas Co. v. Federal Power Commission, 67 S. Ct. 1482, 331 U. S. 682, 91 L. Ed. 1742, is a case involving the jurisdiction of the Federal Power Commission, we note this expression:

"In denying the Federal Power Commission jurisdiction to regulate the production or gathering of natural gas, it was not the purpose of Congress to free companies such as petitioner from effective public control. The purpose of that restriction was, rather, to preserve in the States powers of regulation in areas in which the states are constitutionally competent to act. . . . "

"Clearly, among the powers thus reserved to the States is the power to regulate the physical production and gathering of natural gas in the interest of conservation or of any other consideration of legitimate local concern."

Here the Corporation Commission has fixed a minimum price for gas in a natural common reservoir; such price to be applied at the wellhead as a condition of the taking. The regulation applies to the production of natural gas and though it results in an incidental effect upon the sale price for gas after the gas has been reduced to possession, the subsequent sale of the gas for delivery into another state does not brand the Commission order as a regulation of interstate commerce. The regulation is imposed before any operations of interstate commerce occur. In Parker, Director of Agricul-

ture, et al. v. Brown, 317 U. S. 341, it is said:

" . . . No case has gone so far as to hold that a state could not license or otherwise regulate the sale of articles within the state because the buyer, after processing and packing them, will, in the normal course of business, sell and ship them in interstate commerce."

We do not perceive that the commerce clause of the Federal Constitution precludes the state in the protection of local interests from fixing a uniform minimum price consideration as a condition of the taking of natural gas from a common reservoir because a producer therefrom may have contracted or will contract for sale and delivery of his share of the production outside the state, or because a purchaser from such producer will sell and transport the gas in interstate commerce.

The general order of the Commission fixing the minimum price for gas taken from the field as a part of the order requiring Cities Service to take ratably from the Peerless wells and as applied to Cities Service has the effect of requiring Cities Service to take ratably from Peerless and pay for the gas so taken at a price equal to the minimum price it must obtain for gas from its own wells offered at the well. If it may be said that under the price-fixing order, Cities Service with ownership of pipeline facilities, might take gas from its own wells and after payment of public charges and royalty claims on the gas on a basis of the minimum price fixed by the state, run the gas across the state line and there with profit make disposition of the gas at prices below the minimum fixed by the state, it does not follow that it has a right to use its pipeline facilities to gather gas from other wells on such basis, in otherwise disregard of price regulations, or that it may so use its wells as to effect a drainage from others without liability having relation to the price regulation.

Undisputedly, the production from the Cities Service wells was resulting in drainage of the area where the Peerless wells were located and Cities Service offered to take ratably from the Peerless wells with its taking from its own wells. The effect was an offer to take the gas at the average price prevailing in the field, or on the terms of a "common purchaser" of gas in the field. Cities Service suffered no prejudice to its rights in the fact that the Commission saw fit to investigate field conditions after dispute has arisen growing out of drainage from Peerless wells, or in the fact that a fixed price for gas was established. The order prohibiting Cities Service from taking gas from its wells except that it take ratably from the Peerless wells, insofar as it fixes the price for the gas so taken, is the same as that required of any purchaser of gas from the field. There occurs no greater invasion of Cities Service's rights than depriving it of the right to drain gas from beneath the Peerless lease without paying for it. The overall effect of the order is to furnish a practical alternative, consistent with production by both Cities Service and Peerless, to protect Peerless from drainage by Cities Service.

We find no basis in the due process and equal protection clauses of the Federal and State Constitution for condemning the orders in their application to Cities Service.

Cities Service complains of certain rulings in reference to certain pleadings filed and complains of the Commission's conduct and rulings in the course of the various hearings held leading up to the promulgation of the orders here under attack.

The orders are legislative in character and subject in a large measure to the rules and principles by which the validity of statutes are determined. In the hearings preceding the orders, and not for violations thereof, the rules and principles of procedure obtaining in the enactment of a statute more

nearly apply than the strict rules applicable to law courts.

We have examined the record and find substantial evidence to support the Commission's findings and no error of law is committed.

Phillips Petroleum Company in application to the Commission to vacate the orders introduced testimony to the effect that it owns oil and gas leases on several thousands of acres of land in the Guymon-Hugoton Field, and several producing gas wells thereon, and was presently taking several millions cubic feet of gas daily from such wells; that Phillips sells no gas produced from said field in the State of Oklahoma, but gathers gas from its wells through its own gathering system to a central point in the State of Texas where it processes the gas and extracts therefrom natural gasoline and other hydrocarbons and sells the residue gas; that it sells such residue gas to Panhandle Eastern Pipe Line Company at 4c per 1,000 cubic feet; that it has agreed to sell and deliver to Panhandle Eastern all of the gas it produces from 175,000 acres under lease in Texas county, subject to its right to extract natural gasoline and other liquid hydrocarbons from said gas prior to the delivery of such gas to Panhandle Eastern at the said central point in Texas.

Phillips here adopts the brief of Cities Service and with enlargement of argument here presents similar contentions concerning the authority of the Commission to make the orders appealed from and the constitutionality of the orders appealed from.

Our discussion of the Cities Service appeal is here applicable. We find no basis in the due process and equal protection clause of the Federal and State Constitutions for condemning the orders appealed from in their application to Phillips.

The orders appealed from are affirmed.

DAVISON, C.J., ARNOLD, V.C.J., and CORN and JOHNSON, JJ., concur. GIBSON, LUTTRELL, HALLEY, and O'NEAL, JJ., dissent.

HALLEY, J. (dissenting). There are two conclusions in the majority opinion in which I cannot concur. I cannot agree that the Corporation Commission has been given authority by the Legislature to make a general order fixing the price of gas for an entire gas field or common source of supply. I cannot agree that the Commission has the authority to require Cities Service to pay to Peerless a price for gas produced in the Guymon-Hugoton field, substantially above the current market price prevailing in that field. It is admitted that if the general price-fixing order for the entire field is authorized, then the price ordered paid to Peerless would necessarily follow the general price for the entire field. However, it is my view that the general price-fixing order is not within the powers granted to the Corporation Commission, and that Cities Service should only be required to pay Peerless the current market price prevailing in that field.

The majority opinion does not claim that general price-fixing authority for a common source of supply has been expressly granted to the Commission. It does conclude that such authority is necessarily implied as a means of carrying out the express powers given the Commission to regulate the production of gas, the prevention of waste, the protection of co-equal rights, and the interests of the state and its citizens. These are all worthy objectives. The conservation of a great natural resource challenges the best efforts of all, but does not warrant the Corporation Commission in exercising powers not delegated to it by the Oklahoma Legislature.

The statutes granting authority to the Corporation Commission to regulate the production of gas are generally referred to as the Acts of 1913 and 1915. The

applicable portion of the 1913 Act, ch. 198, page 440, sec. 3 (sec. 233, Title 52, O.S. 1941), is as follows:

"Any person, firm, or corporation, taking gas from a gas field, except for purposes of developing a gas or oil field, and operating oil wells, and for the purpose of his own domestic use, shall take ratably from each owner of the gas in proportion to his interest in said gas, upon such terms as may be agreed upon between said owners, and the party taking such, or in case they cannot agree, at such a price and upon such terms as may be fixed by the Corporation Commission after notice and hearing; provided, that each owner shall be required to deliver his gas to a common point of delivery on or adjacent to the surface overlying such gas."

In 1915, the following Act, being chapter 197, sec. 5 (sec. 240, Title 52, O.S. 1941) was enacted:

"Every person, firm or corporation, now or hereafter engaged in the business of purchasing and selling natural gas in this state, shall be a common purchaser thereof, and shall purchase all of the natural gas which may be offered for sale, and which may reasonably be reached by its trunk lines, or gathering lines, without discrimination in favor of one producer as against another, or in favor of any one source of supply as against another save as authorized by the Corporation Commission after due notice and hearing; but if any such person, firm or corporation shall be unable to purchase all the gas so offered, then it shall purchase natural gas from each producer ratably. It shall be unlawful for any such common purchaser to discriminate between like grades and pressures of natural gas, or in favor of its own production, or of production in which it may be directly or indirectly interested, either in whole or in part, but for the purpose of prorating the natural gas to be marketed, such production shall be treated in like manner as that of any other producer or person, and shall be taken only in the ratable proportion that such production bears to the total production available for marketing. The Corporation Commission shall have authority to make regulations for the delivery, metering and equitable purchasing and taking of all such gas and shall have the authority to relieve any such common purchaser, after due notice and hearing, from the duty of purchasing gas of an inferior quality or grade."

Section 2, ch. 197, Session Laws of 1915 (sec. 237, Title 52, O. S. 1941) defines the term "waste" as follows:

" . . . That the term 'waste', as used herein, in addition to its ordinary meaning, shall include escape of natural gas in commercial quantities into the open air, the intentional drowning with water of a gas stratum capable of producing gas in commercial quantities, underground waste, the permitting of any natural gas well to wastefully burn, and the wasteful utilization of such gas."

The foregoing definition of "waste" was enlarged by the Legislature in 1933 and in 1935, and the term "wasteful utilization" was changed to "inefficient utilization".

It is a cardinal rule of statutory construction that the primary aim is to arrive at the intention of the Legislature. This ancient rule was announced in United States v. Temple, 105 U. S. 97, 26 L. Ed. 967, in the following words:

"Our duty is to read the statute according to the natural and obvious import of the language, without resorting to subtle and forced construction, for the purpose of either limiting or extending its operation. When the language is plain, we have no right to insert words or phrases so as to incorporate in the statute a new and distinct provision."

Again, in Russett School District No. C-8 v. Askew, 193 Okla. 102, 141 P. 2d 575, this court stated in the body of the opinion:

"As has often been said, the cardinal rule in such cases is to ascertain and give effect to the legislative intention. That intention is to be first sought in the language of the statute itself, and

if it is there plainly expressed, it must be followed without further inquiry."

The majority opinion correctly states the rule of construction to the effect that where an officer or government agency charged with the duty of administering a law construes the law and such construction is acquiesced in for a long period of time, such construction should be given great weight by the courts when called upon to construe such law. However, I am unable to agree that the record before us discloses that the Corporation Commission, charged with the duty of administering the law relating to the production of gas, has construed the regulatory Acts as giving it the authority to fix the price of gas produced from a reservoir, except where seller and buyer fail to agree upon a price, or that such construction has been long acquiesced in.

During the more than thirty years that the Commission has been charged with the authority to regulate the production of gas, there is shown only a single instance where it fixed the price of gas for a field or common source of supply. In 1920 the Oklahoma Natural Gas Company was taking gas from the Cushing Field in Creek county at 6c per MCF, and selling it to consumers. The producers were threatening to disconnect their wells. They appealed to the Commission to fix a higher price. The Commission entered an order fixing the price for the entire Cushing field at 10c per MCF. This order was not appealed from, and it is not shown how long it was effective. There had evidently been a previous agreement as to price. It was not shown whether all, or what per cent, of the producers joined in the application to the Commission.

In 1924 the Commission entered an order prohibiting the use of gas for the manufacture of carbon black. The order was appealed from to this court, which affirmed the order on the ground that the use complained of was a "wasteful utilization" of gas. The case is reported as Quinton Relief Oil & Gas Co. v. Commission, 101 Okla. 164, 224 P. 156. The court held that chapter 197, Session Laws of 1915, conferring upon the Commission the power to make rules and regulations to prevent the "wasteful utilization" of natural gas, also gave that body the power to define what uses are within the scope of that term.

In 1937, in Re Application of Jackson, 179 Okla. 577, 66 P. 2d 1101, this court upheld an order authorizing the use of gas for the manufacture of carbon black as not being a "wasteful utilization". Reference is made to the Quinton case above, where such use was held to be wasteful, and it is held that if the Commission could determine what is "wasteful utilization", it could also determine what use is not wasteful.

In 1944, the War Production Board requested the Commission to enter an order granting authority to use natural gas for the manufacture of carbon black in the Guymon-Hugoton field. The order was issued and the price to be paid fixed at 5c per MCF, being approximately the market price in the field. The order was not appealed from. It was an emergency war order.

The above record does not support the claim that the Corporation Commission has construed the statutes mentioned as giving it the power to fix the price of gas for an entire field. During the years these statutes have been in effect, most of the major gas fields of Oklahoma have been discovered and developed. I agree that "implied powers" flow from a grant of express powers, and that they are those powers necessary or incidental to the exercise of the express powers. The power to fix prices is a drastic one. In H. F. Wilcox Oil & Gas Co. v. Walker, 168 Okla. 355, 32 P. 2d 1044, this court announced the rule relative to implied powers as follows:

"It is well established that the authority of the Commission is definitely

limited to the power expressly or by necessary implication granted to it by the Constitution and the statutes."

That case involved the proration of oil, but the same principle is applicable to the authority of the Commission with respect to gas.

The majority opinion quotes extensively from the dissenting opinion by Justice Rutledge in the case of Republic Natural Gas Co. v. State et al., 334 U.S. 62, 92 L. Ed. 1212. However reasonable and persuasive that dissenting opinion, concurred in by three other members of the court, may be, it is not the law.

If it had been the intention of our Legislature to grant to the Commission the power to fix the price of gas at the wellhead for an entire field, the addition or inclusion of a few simple words in the statutes granting regulatory authority to the Commission would have settled the matter beyond doubt. Why did the Legislature expressly grant authority to fix the price of gas where seller and buyer fail to agree, and fail completely to grant such authority in the vastly wider and more important field of fixing the price over an entire field or common source of supply? It is incredible that the Legislature would expressly grant such authority in a narrow field and leave it to be implied in a vastly wider and more important area. A gas field, or common source of supply, is the basic unit to which conservation orders are generally applicable. The order of the Commission, which is approved by the majority opinion, means that the Commission may fix the price of gas in every field in the state. The production of oil is under the jurisdiction of the Commission under similar statutes authorizing the prevention of waste, the protection of co-equal rights, and conservation, yet the Commission has never asserted that it had the power to fix the price of oil. It is true that oil may be stored and transported in various ways, while gas cannot be stored and must be transported by pipeline.

It is not my view that conditions do not exist or may not hereafter arise in the Guymon-Hugoton field which may justify drastic regulatory measures by the Commission. The producers who have no pipeline facilities are wholly dependent upon those who have such outlets. These facts have prompted the Legislature to give the Commission express powers to prohibit discrimination and to protect the interests of all parties. The landowner is especially interested because he cannot receive, store or distribute his share of the gas produced from his land, but is dependent upon the limited number of purchasers in the field. It may be that the royalty owners are not receiving their proper share of the proceeds of gas produced and marketed from their land. If they are not receiving their just shares under the terms of their lease contracts, they should seek relief in the courts and not before the Corporation Commission. It may be that gas is selling at a price lower than its intrinsic value, but this does not justify the Commission in fixing the price until the Legislature has given it such power by clear and unmistakable terms, or by necessary implication.

The evidence shows that no physical waste is being practiced in the Guymon-Hugoton field. The only venting of gas is in the drilling and completion of wells, which is expressly allowed by statute. There is no claim of wasteful utilization. The gas is being sold for fuel, light, or power—all useful purposes.

The evidence as to the effect of price-fixing to prevent economic waste is too vague and nebulous to justify serious consideration. It is based largely upon the comparative values of competitive fuels, such as coal and oil, and if followed in the Guymon-Hugoton field, the price of gas there would be so high that producers could not possibly compete with gas produced from other fields in Oklahoma, or in other states; and if the order of the Corporation Commission is made effective, there

might result a forced shut-down of the entire field, depriving the state and its interested citizens of their right to compete in the open market in disposing of their gas.

The price fixed by the Commission, where seller and buyer are unable to agree upon a price, should be the current market price prevailing in the field. Any other price would be unfair, discriminatory, and inequitable.

If the Legislature had intended to give the Corporation Commission authority to fix the price of natural gas in every gas field in the state, such authority would have been expressly given. Failure to express such intention is proof that no such intention existed. To read into the statutes such drastic power is nothing short of legislation by judicial construction, and for the foregoing reasons I respectfully dissent.

GIBSON, J. (dissenting). Apart from what has been stated in Justice Halley's dissenting opinion and from other considerations upon which error in the holding of the majority opinion might be grounded, I am of the opinion the following considerations clearly demonstrate that the statement in the opinion that the Corporation Commission has authority to fix the price at which natural gas may be produced and taken from the field is not only without authority in law but is judicial legislation and that too in the face of a legislative enactment to the contrary.

The private ownership of the gas is recognized and the right of sale as an incident of ownership obtains under and is protected by the Constitution until qualified under proper authority. The Corporation Commission is without power to invade the right of the owner to sell and of the purchaser to buy except to the extent the right so to do is granted by the Legislature under authority of the Constitution.

In 1913 (S. L. 1913, ch. 198, sec. 3) such right, subject to limitations, was granted as follows:

"Any person, firm or corporation, taking gas from a gas field, except for purposes of developing a gas or oil field, and operating oil wells, and for the purpose of his own domestic use, shall take ratably from each owner of the gas in proportion to his interest in said gas, upon such terms as may be agreed upon between said owners, and the party taking such, or in case they cannot agree at such a price and upon such terms as may be fixed by the Corporation Commission after notice and hearing; provided, that each owner shall be required to deliver his gas to a common point of delivery on or adjacent to the surface overlying such gas."

This section has been carried forward in the 1921, 1931 and 1941 statutes, and now appears as Tit. 52 O. S. 1941 §233.

The conclusion of the court that the Commission has plenary authority to fix the price of gas in the field is implied from the provisions of S. L. 1915, ch. 197, §4, which is as follows:

"Whenever the full production from any common source of supply of natural gas in this state is in excess of the market demands, then any person, firm or corporation, having the right to drill into and produce gas from any such common source of supply, may take therefrom only such proportions of the natural gas that may be marketed without waste, as the natural flow of the well or wells owned or controlled by any such person, firm or corporation bears to the total natural flow of such common source of supply having due regard to the acreage drained by each well, so as to prevent any such person, firm or corporation securing any unfair proportion of the gas therefrom; provided, that the Corporation Commission may by proper order, permit the taking of a greater amount whenever it shall deem such taking reasonable or equitable. The said commission is authorized and directed to prescribe rules and regulations for the determination of the natural flow of any such well or wells, and to regulate the taking of natural gas from any or all such common sources of supply within the state, so as to prevent waste,

protect the interests of the public, and of all those having a right to produce therefrom, and to prevent unreasonable discrimination in favor of any one such common source of supply as against another."

This section, together with other provisions of the 1915 Act, was also carried forward in the 1921, 1931 and 1941 statutes, and the same now appears as Tit. 52 O. S. 1941 §239.

That under such circumstances the quoted statutes are in pari materia there can be no question. And such fact has been expressly declared by this court in Republic Natural Gas Co. v. State, 198 Okla. 350, 180 P. 2d 1009 (app. dismissed 68 S. Ct. 972, 334 U. S. 62, 92 L. Ed. 1212) wherein there is said:

"It is also significant that both the 1913 Act and the 1915 Act were brought forward in the 1921 Statutes, the 1931 Statutes, and the 1941 Statutes, so that it is apparent that the Legislature in adopting the 1941 Statutes did not consider the 1913 Law superseded by the 1915 law."

The established rule of construction in such situation is to treat the sections as parts of one law. The rule is thus stated in 59 C. J. 1043, §620:

" . . . It is a well established rule that in the construction of a particular statute, or in the interpretation of its provisions, all statutes relating to the same subject, or having the same general purpose, should be read in connection with it, as together constituting one law, although they were enacted at different times, and contain no reference to one another."

This rule has been repeatedly recognized and applied by this court. Ratliff v. Fleener, 43 Okla. 652, 143 P. 1051 1052; Jefferson v. Cook, 53 Okla. 272, 155 P. 852, 855. We there expressly held the acts relating to the subject should be read together as constituting "one law."

The fundamental rule of construction is the determination of the intent of the Legislature that is embodied in the law.. And the same is to be ascertained primarily from the language used in the statute and where the language of the statute is plain and unambiguous there is no occasion for construction. McCain v. State Election Board, 144 Okla. 85, 289 P. 759, 761. (See, also, text and cases cited thereon in 59 C. J. 952, §569). In such situation, where the meaning of the language is plain, it *must* be given effect by the courts. Osage County Motor Co. v. Pappin, 139 Okla. 23, 281 P. 217; Pasley v. Union Nat. Bank of Bartlesville, 137 Okla. 171, 278 P. 621. (See further text and cases cited 59 C. J. p. 955). Another pertinent rule is where statutes are in pari materia they should so far as possible be construed as in harmony with each other. State et al. v. State ex rel. Shull, State Bank Com'r, 142 Okla. 293, 286 P. 891.

Now, consider the two sections of the one law in the light of these rules.

Section 233 deals specifically with the extent of the power to fix prices that may be exercised by the Commission. This power is not plenary and the very idea that it may be so considered is expressly negatived by the requirement of conditions to the exercise thereof. Section 239 does not even purport to deal with the definition of Commission's power. But even if it can be construed as involving the exercise of price-fixing power, it can be none other than that which is provided for in section 233, to be exercised under the conditions therein prescribed. To hold otherwise is not only to fail to harmonize the two provisions, but is to ignore a legislative intent which is expressly declared. Upon what theory can you imply a legislative intent that is different from and contrary to that which is expressly and plainly declared in the law being construed?

I consider the effect of the holding of the majority to be even more serious than a distortion of the legislative intent, because to the extent it recog-

nizes in the Commission a power in excess of the limitation imposed by the Legislature, it involves an impairment of property rights.

If the better enforcement of the law requires that the Corporation Commission be clothed with more power than that expressly granted in the law, such fact is a challenge to further legislative action to be taken with due regard to constitutional limitations. Such need can afford no justification for this court to invest the Commission with the power by judicial fiat.