**NATURAL GAS PIPE LINE CO. OF AMERICA**

v.

**PANOMA CORP. et al.**

No. 35203.

Supreme Court of Oklahoma.

Sept. 15, 1953.

Rehearing Denied March 23, 1954.

Application for Leave to File Second Petition for Rehearing Denied May 25, 1954.

356

S. A. L. Morgan, Houston, Tex., D. H. Culton, Amarillo, Tex., Warren T. Spies, Chicago, Ill., and Coleman Hayes, of Oklahoma City, for plaintiff in error.

Robinson, Shipp, Robertson & Barnes, Richardson, Shartel & Cochran, Blakely Murphy, Oklahoma City, for defendant in error Panoma Corp.

Floyd Green and Ferrill Rogers, both of Oklahoma City, for Corporation Commission.

WELCH, Justice.

The Panoma Corporation owns extensive oil and gas leases in the Guymon-Hugoton gas field in Texas County, Oklahoma. Gas in large quantities is taken therefrom daily pursuant to a contract between Panoma and The Natural Gas Pipeline Company of America.

This contract was made and this gas taking began before the State Corporation Commission by its orders Nos. 19514 and 19515 fixed the price at not less than 7¢ per thousand cubic feet at the wellhead for all natural gas taken from the producing structures or formations of said gas field.

Those orders were upheld by the Supreme Court of Oklahoma and by the Supreme Court of the United States in 1950. Cities Service Gas Co. v. Peerless Oil & Gas Co., 203 Okl. 35, 220 P.2d 279; Cities Service Gas Co. v. Peerless Oil & Gas Co., Corpo-

ration Commission of Oklahoma, 340 U.S. 179, 71 S.Ct. 215, 95 L.Ed. 190. Thus, since the effective date of the aforesaid orders, January, 1947, no one could legally take natural gas from that field at a price less than 7¢ at the wellhead.

■ The authority of the State in the exercise of its police power to regulate the taking of natural gas is well settled. See Julian Oil & Royalties Co. v. Capshaw, 1930, 145 Okl. 237, 292 P. 841; Wilcox Oil & Gas Co. v. State, 1933, 162 Okl. 89, 19 P.2d 347, 86 A.L.R. 421; Sterling Refining Co. v. Walker, 1933, 165 Okl. 45, 25 P.2d 312; Russell v. Walker, 1932, 160 Okl. 145, 15 P.2d 114; Patterson v. Stanolind Oil & Gas Co., 1938, 182 Okl. 155, 77 P.2d 83, appeal dismissed 305 U.S. 376, 59 S.Ct. 259, 83 L.Ed. 231; Croxton v. State, 1939, 186 Okl. 249, 97 P.2d 11; Denver Producing & Refining Co. v. State, 1947, 199 Okl. 171, 184 P.2d 961; Quinton Relief Oil & Gas Co. v. Corp. Comm. of Oklahoma, 1924, 101 Okl. 164, 224 P. 156, and Cities Service Gas Co. v. Peerless Oil & Gas Co., 1950, 203 Okl. 35, 220 P.2d 279.

The contracted price Natural was to pay Panoma for gas taken under the contract was less than 7¢, but the contract was definitely subject to any valid order of the Corporation Commission. The contract in Article Fourteenth provided that:

"This contract is subject to present and future valid laws and present and future lawful orders of all regulatory bodies now or hereafter having jurisdiction over the parties; and should at any time during the term of this contract either party, by force of any such law or regulation imposed, be ordered or required to do any act inconsistent with the provisions of this contract, the contract shall, subject to the other provisions hereof, continue nevertheless, but shall then be deemed modified to conform with the requirements of such law or regulation."

■ See, also, the following language of this court in State ex rel. Roth v. Waterfield, 167 Okl. 209, 214, 29 P.2d 24, 29:

"Thus it may be seen that changes in the obligations of contracts may be made when made as a proper exercise of the police power, not because constitutions may be suspended by police power, but because the right to legislate in the exercise of that power is a part of the existing law of the state at the time of the execution of the contract, and as such enters into the terms and provisions of the contract in the same manner that statutes prescribing procedure become a part of the contract.

"It may be said that all property rights including contracts are subject to the proper exercise of the police power, and in that respect it is often said that individual rights to property being subject to the exercise of this power are qualified as distinguished from absolute."

See, also, Home Building & Loan Ass'n v. Blaisdell, 1933, 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413.

So in 1951, after the aforesaid Price Order of Commission had been fully sustained, Panoma, after demand, made this application to Commission to require Natural to comply with said order to pay a wellhead price of 7¢ for gas taken and to be taken by Natural from Panoma's leases in said field in Texas County.

Natural responded, in substance, that by reason of the terms of the contract Commission's price order was not applicable to the gas taken by Natural; and that if proper analysis be made there was no violation of the price order in the taking of gas from this field by Panoma and Natural because such taking under the contract resulted in an aggregate or gross return to Panoma equal to a wellhead price of 7¢ or more.

Upon trial Commission made its findings and entered its order. Commission found, among other things, 1, that since the effective date of the price order January 1, 1947, no one could legally take gas from this field at a price less than 7¢ per thousand cubic feet; 2, that the uncertainty as to the finality of that order, created by the appeal therefrom to the Supreme Court of Oklahoma, and the Supreme Court of the United States, justified Panoma in delivering gas from these leases to Natural without regard

to said price order, or at less than the minimum price under the contract until said order was finally affirmed; 3, that nevertheless the taking of gas from the structure and formation in these leases at a price less than 7¢ at the wellhead was illegal; 4, that Natural should pay to Panoma the difference between the lesser amount actually paid for gas taken before June 1st, 1951, and the sum or price due at 7¢ for each thousand cubic feet; 5, that the actual amount of gas so taken from the leases was stipulated and was determined in accordance with such stipulation; 6, that therefore Natural should in twenty days pay the sum due Panoma; 7, that strict enforcement of the price order was necessary for the prevention of waste; 8, that the contract between Panoma and Natural could not impair or defeat the effect of the order; 9, that the acceptance of the contract contention would cause and invite discrimination and general breakdown of the regulation preventing waste, etc.

Commission ordered in effect that Natural should pay for all gas received on and after January 1, 1951, at the sum and rate of 7¢ per thousand cubic feet at the wellhead. Commission further ordered that Natural should pay to Panoma a "back-pay" sum sufficient to equal 7¢ per thousand cubic feet for all gas taken by Natural prior to January 1, 1951, at a lesser price.

Commission further ordered that if Natural should fail after 20 days to pay such "back-pay" sum to Panoma, or should fail to pay as much as 7¢ wellhead price for gas taken after January 1st, 1951, that Panoma should cease any delivery of gas to Natural.

On this appeal Natural contends as upon its response below, with the further contention that Commission's "back-pay" order has the effect of a money judgment which Commission was not authorized to enter.

Natural's contention that Commission's price order was not applicable to the gas taken by Natural was based on Natural's construction of the contract to be a purchase of only a part of the natural gas taken from Panoma's leases. Since Commission did not agree with that construction we must refer to some of the details of the contract, but we deem it not necessary to quote all of the contract of many pages.

As items of background the contract shows that Natural owns an extensive pipeline system by which it transports gas from Texas and Oklahoma to consumers in the Chicago metropolitan area and elsewhere; that with contemplated expansions the system will require on maximum days up to three hundred forty (340,000,000) million cubic feet of gas per day; that Natural desires to purchase from seller (Panoma) as a part of its system needs, a daily average of seventy-six (76,000,000) million feet of gas; that seller owned gas rights in more than seventy-eight thousand (78,000) acres of land in the Guymon-Hugoton field, described by legal description of each tract of land in the contract, and that seller desires (quoted from contract) "to produce the gas underlying said gas reserves and to sell the same to Natural. They have completed a number of gas wells and propose to drill additional gas well thereon, construct gathering lines connecting such wells * * * and install all other necessary facilities and appurtenances, and to operate the same; all for the purpose of delivering gas to Natural under the terms of this contract."

We should here observe that the rough gas as it comes from the well is not suited to transportation in Natural's pipeline, and that the gas must go through a refining or cleaning or improving process before Natural can transport it and sell it to its ultimate consumers. It is essential that such processing be done before the gas is finally taken into Natural's pipeline. That item was considered in the contract and the plan was set out in substance as follows: Seller should deliver the gas direct from the wells to Natural's initial or primary pipe. Natural would then pass it into its own compressor station on or near the seller's premises where Natural would compress the gas, thence it would in turn pass the gas to a processing plant to be constructed and operated by seller.

Panoma was definitely obligated to construct said plant at a cost of several million dollars, and to efficiently operate it and to process the gas through such plant so as to

deliver the gas back to Natural into its pipeline system in a carefully specified condition. When the gas was thus returned to Natural it was to be metered and that measurement was the basis of payment by Natural to Panoma, with provision that title passed to Natural at that point. There was provision in detail as to the operation of this processing plant by Panoma, and in case of failure of Panoma to properly and efficiently operate the plant, Natural had the right to take over such plant and add any needed equipment and operate the plant for seller, all at seller's expense, plus 10% supervising charge, and keep custody and operation of the plant until sellers could give satisfactory assurance as to future operation by sellers.

In processing the gas from Natural's compression station or plant through seller's processing plant the seller was to remove certain detailed constituents of the rough gas including water and a sufficient portion of the hydrocarbons so as to produce a certain specified condition in the gas and so as to prevent the formation of hydrates and/or the condensation of hydocarbons in Natural's pipeline system. But seller was prohibited from removing hydrocarbons to the extent of reducing the heating value of the gas below a fixed figure.

All constituents so removed from the rough gas which had any value was to be kept by sellers as their own property, or for sale by them for their own account.

The contract provided that it was contemplated by the parties that all of the gas underlying seller's reserves of 78,000 acres would be required to fulfill this sale contract, and that all such gas was reserved for deliveries under this contract, and that all of the entire gas reserve was dedicated to the purpose of this sale contract, and none of such gas under the entire area should be sold to any other person. To this last provision there were minor exceptions including or preserving the rights of landowner-lessors to have gas for domestic usage, and the right of sellers to use gas required for operation of the leaseholds, but we regard those items as being immaterial here.

Natural places great emphasis on part of these contract provisions and argues that in fact it did not purchase from Panoma all of the gas produced from the wells and first delivered to Natural to enter its compressor. Natural contends that since Panoma thereafter extracted part of the constituents of the rough gas that Natural bought only a part or portion of the whole gas, and much emphasis is placed on the provision that it is only the gas in its final purified form which was metered and title passed to Natural which Natural bought, and in that manner took from the gas wells. Natural contends, and the proof shows, that Panoma marketed certain of the extracted constituents from the gas and that Panoma received substantial sums therefor. In final analysis it is the contention of Natural that the sum it paid to Panoma for the gas taken into its pipeline plus the gross amount received by Panoma for the sale of extracted ingredients amounted to as much or more than 7¢ for each thousand cubic feet of natural gas taken from the wells, and that therefore the taking from the gas reservoir was not in violation of Commission's price order.

This calculation by Natural would add the gross sum received by Panoma for all sales of extracted ingredients as if the gross sum amounted to a payment to Panoma on or for the wellhead gas. That calculation, however, overlooks these facts: (1) that such payments to Panoma are more in the nature of payments for manufactured commodities than payments for natural gas, (2) that no account is taken of the great cost of building, maintaining and operating the expensive plant required in the process and required by the contract; (3) that, as between Panoma and Natural, Panoma has earned the value of these extracted ingredients by treating or processing Natural's gas to bring it to the precise condition required by Natural in its business, and specifically required by the contract, (4) the well known fluctuation in market price of such commodities which would result in Panoma operating its plant at different times at more or less profit, or more or less loss.

This contention by Natural does not take into consideration any part of the cost of the processing operation. In order to determine whether the value of the extracted ingredients exceeded the processing expense, or whether Panoma made a profit on the processing operation, the calculation must necessarily include the cost of operating its processing plant plus some contribution to the cost of construction of the plant, or to depreciation, which is not included in Natural's calculation and argument.

Furthermore, this contention by Natural does not give sufficient emphasis to the contract provision that Panoma must construct and operate the plant, whether profit or loss is realized from the sale of the extracted constituents of the rough gas.

Panoma contends, and there is evidence to support it, that proper calculation of the operating cost of processing the gas, with proper charge for depreciation of the plant, or proper cost amortization, with maintenance and replacement costs, would result in showing a loss, or little if any profit at all, and might very well at different periods show an actual loss; that in any event the amount of profit or loss would fluctuate over varying periods, and could not enter into such a calculation as that proposed by Natural, because it would result in different calculations over varying periods, and would result in Natural's paying one price in one period to bring the aggregate up to 7¢ and a different price over a different period to bring such aggregate up to 7¢. Thus Panoma points out that Natural would be operating upon a different pay basis for each month, or for each quarter or for each semi-annual or annual period. And Panoma takes the view that Natural in effect and in fact is the purchaser of natural gas from the gas wells and not merely a purchaser of part only of the gas produced.

We think a consideration of all of the provisions of the sale contract is necessary to decide this controlling question. We think the narrow view of Natural was properly denied by Commission. It seems well demonstrated by the overall plan that Natural, if not in fact purchasing all of the gas located in Panoma's gas reserve, was at least purchasing all of the gas actually produced and run into the primary line of Natural and thence to its compressor station. The temporary return of the gas to Panoma after Natural had compressed it was a custody or possession for a particular purpose, that is, to clean up or purify or process the rough gas for one purpose only, and that was to redeliver the gas in a stipulated condition to Natural. This processing may or may not have resulted in a profit to Panoma in the past, and it may or may not result in a profit to Panoma in the future. Nevertheless, that processing must be performed by Panoma. It is essential to Natural that it be done. The contract so provides, and in addition thereto the contract authorized Natural, in the event of unsatisfactory operation by Panoma, to take over the plant and operate it at the cost of Panoma plus 10% management expense.

Panoma produced the rough gas and delivered it to Natural. Thereafter when Panoma received back the gas and processed it and redelivered it to Natural, we regard that as merely a detail of the overall plan of processing the gas in selling and delivering it to Natural. We notice the fact that it was metered on this second delivery and that the expression was used that title passed at that point, but we do not consider that in any sense controlling, if it is even material in deciding the controlling question.

We deem it fair to assume, as apparently Commission assumed, that as between the contracting parties the recovery by Panoma of any salable products was to balance or offset the overall cost to Panoma of carrying out its obligation to Natural to place Natural's gas in proper condition to enter Natural's pipeline system and proceed to the burner tips of Natural's customers, with any loss in the processing to be suffered by Panoma, and any profit therein to offset the hazard of a loss, or the profit or chance of profit over one period to offset the loss or chance of loss during another period. Thus a similar situation would be created as if Natural, after first receiving the gas and compressing it, had employed or contracted with some other person to process its gas in exchange for the value of the extracted ingredients necessary to put the gas in the

required condition for ultimate use by Natural.

The contract provides that Panoma desires to sell Natural all the gas underlying its entire gas reserves; and that Panoma has completed a number of gas wells and will drill additional wells and install gathering lines, etc., and operate the entire production, all for the purpose of delivering gas to Natural; and that it is contemplated by both parties that all the gas underlying Panoma's acreage will be necessary to cover Natural's requirements and to fulfill the sale contract; and that all of the entire gas production of Panoma is reserved for deliveries under the contract; and that all of Panoma's gas reserve is dedicated to the purpose of this sale contract; and that none of such gas shall be marketed to any other person; and reference is made to Natural's lien of dedication on Panoma's leaseholds themselves.

These contract provisions tend strongly to support Commission's findings, and to indicate that in truth and in fact Natural bought and contracted to buy all of Panoma's natural gas in the ground and to be produced from under this 78,000 acres, and that all provisions for drilling, producing, piping, compressing, processing, metering, etc., were merely details of delivery to Natural of that which it had already bought.

We therefore agree with the conclusion of Commission that Natural purchased and took natural gas from this reservoir at less than 7¢ per thousand cubic feet wellhead price. The extent thereof was in the amount stipulated and therefore found by Commission.

■ There was some contention on the part of Natural that it did not take "natural gas" from the structures and formations of the Guymon-Hugoton field because the gas it finally took and paid for was not in fact "natural gas." This contention was based on the facts above set out. No authority is cited to sustain the conclusion that natural gas produced from the earth and transported to consumers who use and burn it as such, is changed into something different because of the fact that after it is taken from the well it is cleaned up and processed before final delivery to the ultimate consumer. Furthermore, the contract specifically provides that "the term 'gas' whereever used herein, shall mean natural gas;" with further statement which makes the words "herein" refer to all provisions of the comprehensive contract.

On this overall contention Natural cites Phillips Petroleum Co. v. State, included by consolidation with Cities Service Gas Co. v. Peerless Oil & Gas Co., 203 Okl. 35, 220 P.2d 279. We have considered that cited authority, but do not find anything therein which might in any manner support the position and contention of Natural in this case. We deem it not necessary to further discuss the Phillips case.

■ In this case Natural was not a producer of natural gas, but it was a purchaser of natural gas produced by Panoma. The question here is whether Natural paid the necessary 7¢ per thousand cubic feet wellhead price. If Natural paid Panoma less than the proper 7¢ wellhead price, then there was a violation of the price order which was made and became effective after the contract was made, and the price order would govern and control over the contract price of less than 7¢. Upon that point, as above stated, we have approved the conclusion of the Commission.

Natural next contends that the order of Commission requiring Natural to pay to Panoma the "back pay" sum on all gas taken before January 1, 1951, amounted to a judgment for that sum of money in favor of Natural and against Panoma, and that the Corporation Commission was not authorized to enter any such money judgment.

■■ We do not agree that the order of Commission was in any sense the rendition of a money judgment against Natural. It was merely a calculation and statement of the amount Natural should have paid for the gas taken before January 1, 1951, to comply with the price fixing order. There was no controversy as to the contract between the parties, nor as to the amount of gas Natural had received from the wells of Panoma, nor as to the amount Natural had paid on the purchase price thereof. By express provision of the contract, as well as by law, the contract was modified by the

price order and the minimum wellhead price of 7¢ became a part thereof and Natural was obligated by law to pay that price of 7¢. The calculation and statement of this "back pay" sum by Commission was merely a statement of the further sum Natural should pay to bring itself in full compliance with the minimum price requirement. Commission could not enforce it as a money judgment, however, this does not mean that Commission is without any power to enforce compliance with its valid price fixing order. As in case of any other valid order, Commission may require compliance therewith by any other order within its authority, so in this case, while Commission could not require Natural to pay this sum, it could prohibit Natural from taking further gas until it brought itself into compliance with the effective price order by making the payment. If it were otherwise Commission would be powerless to take any steps to require compliance with its valid orders in the highly important program of conservation, and might as well not make them.

We hold that the order as to this "back pay" sum was within the authority of Commission. This conclusion finds support in our statements in Cities Service, supra.

Natural further contends that the orders here involved constitute an undue interference with Interstate Commerce, and that such orders are violative of the Commerce Clause of the federal Constitution.

We deny that contention on the authority of Cities Service case, supra. In that case it was contended that the action of the Corporation Commission in making and enforcing the specific wellhead price orders now involved in this case would so violate the federal Constitution.

Speaking on that point the Supreme Court of the United States said: 340 U.S. 186, 71 S.Ct. 219, 95 L.Ed. 202.

"The Commerce Clause gives to the Congress a power over interstate commerce which is both paramount and broad in scope. But due regard for state legislative functions has long required that this power be treated as not exclusive. (Citing authorities.) It is now well settled that a state may regulate matters of local concern over which federal authority has not been exercised, even though the regulation has some impact on interstate commerce. (Citing authorities.) The only requirements consistently recognized have been that the regulation not discriminate against or place an embargo on interstate commerce, that it safeguard an obvious state interest, and that the local interest at stake outweigh whatever national interest there might be in the prevention of state restrictions. Nor should we lightly translate the quiesence of federal power into an affirmation that the national interest lies in complete freedom from regulation. (Citing authorities.)

"That a legitimate local interest is at stake in this case is clear. A state is justifiably concerned with preventing rapid and uneconomic dissipation of one of its chief natural resources. The contention urged by appellant that a group of private producers and royalty owners derive substantial gain from the regulations does not contradict the established connection between the orders and a state-wide interest in conservation. (Citing authorities.)

"We recognize that there is also a strong national interest in natural gas problems. But it is far from clear that on balance such interest is harmed by the state regulations under attack here. Presumably all consumers, domestic and industrial alike, want to obtain natural gas as cheaply as possible. On the other hand, groups connected with the production and transportation of competing fuels complain of the competition of cheap gas. Moreover, the wellhead price of gas is but a fraction of the price paid by domestic consumers at the burner-tip, so that the field price as herein set may have little or no effect on the domestic delivered price. Some industrial consumers, who get bargain rates on gas for 'inferior' uses, may suffer. But strong arguments have been made that the national interest lies in preserving this limited resource for domestic and industrial uses

for which natural gas has no completely satisfactory substitute. (Citing authorities.) Insofar as conservation is concerned, the national interest and the interest of producing states may well tend to coincide. In any event, in a field of this complexity with such diverse interests involved, we cannot say that there is a clear national interest so harmed that the state price-fixing orders here employed fall within the ban of the Commerce Clause. (Citing authorities.)"

■ Since the Corporation Commission had authority to make price fixing orders without violating the federal Constitution, then further orders within its authority designed to enforce compliance with such orders would likewise involve no violation of the federal Constitution. To hold otherwise would bring about the result that the Corporation could and did make this specific price fixing order as applied to the Guymon-Hugoton field and the making of the order was not in violation of the federal Constitution, but that subsequent valid orders directing compliance with the price fixing order would so violate the federal Constitution. Such a conclusion, to say the least of it, would be most peculiar and quite illogical. Therefore, and upon the foregoing authorities we find no merit in this contention.

The orders appealed from are affirmed.

JOHNSON, V. C. J., and CORN, DAVISON and ARNOLD, JJ., concur.

HALLEY, C. J., and O'NEAL, WILLIAMS and BLACKBIRD, JJ., dissent.

HALLEY, Chief Justice (dissenting).

The majority opinion in affirming the Corporation Commission in this case is wrong. I am compelled to express a dissent.

On December 1, 1946, Natural Gas Pipe Line Company of America entered into a contract with D. D. Harrington and others who comprised a partnership doing business under the firm name of Harrington and Marsh. Panoma Corporation acquired all

the interest of the partnership in the contract.

Under the contract Natural was to purchase gas from the partnership and pay for it until the first day of July, 1951 at six cents (6¢) per thousand cubic feet. The unit volume for the measurement of gas delivered under the contract was one cubic foot of gas at a base temperature of sixty degrees Fahrenheit (60°F) and at an absolute pressure of sixteen and four-tenths (16.4) pounds per square inch.

Panoma began the delivery of gas to Natural in August, 1948. This gas was paid for at a price basis of 5.12 cents per thousand cubic feet in accordance with the base provided by the Corporation Commission. From August 1948 to the end of 1950 Panoma received from Natural $3,634,523.74.

On December 9, 1946, the Corporation Commission issued an order which is as follows:

"1. That no natural gas shall be taken out of the producing structures or formations in the Guymon-Hugoton Field in Texas County, Oklahoma, at a price, at the wellhead of less than 7¢ per thousand cubic feet of natural gas measured at a pressure of 14.65 pounds absolute pressure per square inch.

"2. This order shall be effective as of January 1, 1947."

Not until January 30, 1951, did Panoma take any action in regard to this matter when it filed an application with the Corporation Commission for a hearing. As a result of the hearings had on this application the Corporation Commission made an order that Natural pay Panoma the difference between the amount it had heretofore paid for such gas delivered to it by Panoma and the amount which the Commission said it should have paid for the gas herein determined, computed at seven cents (7¢) per thousand cubic feet measured at a pressure base of 14.65 pounds per square inch absolute and if Natural did not pay it Panoma should stop delivering gas to Natural. From this order Natural properly appealed.

The evidence taken at the hearing showed that Panoma had received from the

sale of extracted liquids the sum of $2,968,-405.33 in the period August 1948 to December 31, 1951. With the $3,634,523.74 received over the same period from Natural and the amount received from sale of liquids Panoma was paid a total of $6,602,-929.07 or $ .09301 per thousand cubic feet on 14.65 pressure base for all the gas disposed of.

The order of December 9, 1946 fixing the price that should be paid at the wellhead was made as if the producer of the gas was selling at the wellhead. In the instant case the producer, Panoma, was not selling at the wellhead.

At no time did Natural buy the raw gas (spoken of in the majority opinion as rough gas at the wellhead). The contract stated that title to the gas passed to Natural at the meter station and at this point the hydrocarbons had been extracted.

The contract in Section One, Article V, specifically provided that Panoma reserved the right to extract from the gas nitrogen, helium, natural gasoline, propane and other hydrocarbons other than methane, together with any methane necessarily removed from the gas in the process of recovering such other constituents.

The Corporation Commission only has the right to fix the price of gas as a conservation measure under the theory that if no price is fixed that the gas might be consumed in producing cheaper products and full benefit would not be received from the gas. We held that this right was given by implication in the 1915 Conservation Act, Cities Service Gas Co. v. Peerless Oil & Gas Co., 203 Okl. 35, 220 P.2d 279. The order did not attempt to guarantee the producer a profit of 7¢ a thousand and it had no right to attempt to do so. It only said it should not be sold for less than 7¢ per thousand at the wellhead. In my opinion under the evidence and the order of the Commission, Panoma received more than the 7¢ required and for that reason Natural owes Panoma nothing. There was no evidence that there was any waste in the use to which this gas was put.

If Natural is to be charged with the payment of 7¢ per thousand for gas at the wellhead then it should be credited with every-thing that was taken out of the gas as if it was done before it reached the wellhead since Natural only received dehydrated gas. It is no concern of the Corporation Commission as to what price is paid the producer. Their concern is with conservation and to see that the gas is not used in a manner whereby a natural resource would be dissipated without the State receiving the proper benefit.

This Court should not say that a purchaser of dehydrated gas which has constituents extracted to the extent of 45% of the value of the whole should be burdened with paying a fixed wellhead price without receiving any credit for the by-products. The order of the Corporation Commission of December 9, 1946 was not made with the contract in this case in mind. Neither was the contract written with such an order in mind. The order and contract must be considered with the point in mind that the Commission was not guaranteeing a profit to the producer but was endeavoring so as to conserve the gas in this State in this particular area.

I am also of the opinion that the Corporation Commission had no authority to tell Panoma that it must not furnish Natural any more gas unless Natural paid them this $1,300,000. This was a matter for the courts. Our Constitution and Statutes at no place provide for the Corporation Commission taking the action it has in this case by saying to a purchaser of the gas you pay the producer $1,334,960.50 or else the source of supply of gas for many of your customers will be chopped off. The Natural had a binding contract with Panoma through its predecessors and that contract should be interpreted by the courts and not by a regulatory body. In Southwestern Light & Power Co. v. Elk City, 188 Okl. 540, 111 P.2d 820, we said that the Corporation Commission is without jurisdiction or power to enter or enforce a judgment or order adjudicating the claimed contracted rights of a consumer of electric current under a written contract with a utility to receive a stated reduction of rate and refund of money for electric current. The case at bar presents just as much the construction of contractual rights as in that case. I

think that in this case as there the rights of the parties should be determined in courts of general jurisdiction. It is not a job for laymen.

The Corporation Commission has no right to tell the producer he could not sell constituents of raw gas separately. Strictly speaking all the order did was to say that when gas is sold at the wellhead it must bring not less than 7¢ per thousand cubic feet. If the producer desired to retain for his use and profit certain constituents he had a perfect right to do so and as long as there was a substantial compliance with the Commission order it should be sufficient to satisfy the Commission. This was its conclusion as to the right of the Phillips Petroleum Company when it disposed of certain elements of gas separately. In that instance Phillips received 6.9855 cents per thousand cubic feet from all the constituents of the gas.

This Court is given the authority by Section 20, Article IX of our Constitution to exercise its own independent judgment as to both the law and the facts of an appeal involving an asserted violation of any right of the parties under the Constitution of the United States or the Constitution of this State. Such assertion is made in this case. I reiterate that when it appears from the testimony that the producer has received over nine cents for his gas when he had only to receive seven and when under the plain terms of the contract the producer has retained for his own use and benefit certain elements of the gas from which he gets 45% of the total value of all the gas after it has been through the dehydration plant it is contrary to fundamental conceptions of justice to say that the buyer of the dehydrated gas shall pay 7¢ for the raw gas and not receive credit for the profit received from the other constituents of the gas. He did not intend to buy them. The producer did not intend to sell the hydrocarbons. The Corporation Commission was without authority to make a new contract for the parties.

In this case Natural complied with its part of the contract. It did not know what Panoma was receiving for the hydrocarbons that it retained. It had the right to rely on Panoma to comply with the Commission's rules as its contract with Panoma had been in existence four years and two months when Panoma's application was filed with the Commission. Furthermore it had been two years and a half before any action was taken by Panoma to question the position of Natural.

Neither the Constitution, Acts of our Legislature or any decision of this Court provide a penalty for purchasing residue or dehydrated gas at any price. Since the Commission has not provided for this situation by its orders, it cannot assess such a penalty after the taking. Such action on its part is clearly a violation of the due process clause of both the federal and state Constitutions.

The producer cannot "have his cake and eat it too." If he is to sell his gas to the Pipe Line Company at seven cents then he must of necessity account to the buyer for all the by-products or hydrocarbons. Under no interpretation of the contract can Panoma be the employee of Natural. In no way that you can analyze this case can the order of the Corporation Commission be sustained.

·I respectfully dissent.