**NATURAL GAS PIPELINE CO. OF AMERICA**

v.

**CORPORATION COMMISSION et al.**

**MICHIGAN–WISCONSIN PIPE LINE CO.**

v.

**CORPORATION COMMISSION et al.**

**PANHANDLE EASTERN PIPE LINE CO.**

v.

**CORPORATION COMMISSION et al.**

Nos. 35731, 35732, 35734.

Supreme Court of Oklahoma.

April 27, 1954.

Rehearing Denied July 13, 1954.

C. C. McDugald, W. T. Spies, Chicago, Ill., D. H. Culton, Amarillo, Tex., Coleman Hayes, Oklahoma City, for Natural Gas Pipeline Co. of America.

Jack T. Conn, Ada, D. H. Culton, Amarillo, Tex., Coleman Hayes, Oklahoma City, Arthur R. Seder, Jr., Chicago, Ill., for Michigan-Wisconsin Pipe Line Co.

Ross Rizley, L. E. Tyron, Orlando F. Sweet Guymon, Edward H. Lange, Kansas City, Mo., Mark H. Adams, Wichita, Kan., William I. Robinson, Tulsa, for Panhandle Eastern Pipe Line Co.

Cecil C. Hamilton, Oklahoma City, Rayburn L. Foster, Harry D. Turner, R. M. Williams, Kenneth Heady, Bartlesville, for Phillips Petroleum Co.

Floyd Green, Ferrill Rogers, Oklahoma City, for Corporation Commission.

T. Murray Robinson, Leon Shipp, Oklahoma City, Vincent Dale, Guymon, for Members of Texas County Land & Royalty Ass'n.

ARNOLD, Justice.

Certain mineral owners in Texas County, Oklahoma, filed an application before the Corporation Commission for an order determining the minimum price at which gas produced from the Guymon-Hugoton field may be first purchased or sold. Certain producers and purchasers of gas from said field filed their protests and responses. From the Commission's order fixing minimum price at which such gas may be sold Natural Gas Pipeline Company, Michigan-Wisconsin Pipe Line Company and Panhandle Eastern Pipeline Company have

filed their separate appeals, here consolidated.

On behalf of the applicant mineral owners the evidence reasonably tends to show that the Corporation Commission by its order No. 19514 issued effective February 1, 1947, fixed the minimum price at which gas may be produced and taken from the structure in this field at 7¢ per thousand cubic feet; that since that date the price of all other industrial fuels has substantially increased; that comparing the other industrial fuels in most common use, such as coal, residual, crude oil, kerosene, and gasoline with gas on an energy content basis the fuel source cost of natural gas is about one third that of coal (the lowest in price per energy content unit of all the other industrial fuels) and the other fuels increase in cost per energy content unit to the highest, gasoline, which is almost fourteen times greater; that natural gas since 1938 has been lower in price in comparison to its heat energy content than any other fuel because gas has not been on a competitive market while the other fuels are and have been; that in 1950 natural gas supplied 20.94% of the total of mineral energy supplied, produced, and used as fuel in the United States and received only 5.16% of the total dollar income for all energies at their source; that in order to have the same price differential between gas and other fuels as existed in 1947 when the former order of the Commission was entered the price of natural gas would have to be set at 12.64¢ per thousand cubic feet that to compare favorably with other industrial fuels the price should be 25 or 30 cents per 1000 m. c. f.; that increasing the price of gas as taken from the structure would tend to conserve gas and prevent physical waste in that the higher price would allow wells in fringe areas of the field to be drilled and operate at a profit whereas if a price increase is not given such wells cannot economically and will not be drilled resulting in non-development of the field, loss to the owners in such fringe areas and damage to their rights in the common source of supply; that better and more expensive methods of production would be economically feasible which would tend to conserve gas and eliminate the necessity of blowing out the wells to clean them; that the entire Hugoton field is a single reservoir extending from the Texas panhandle across Texas County and into Kansas; that if the fringe wells are not drilled the gas will migrate to existing wells, causing loss to the fringe owners; that the higher price is necessary while marketing facilities are available and if fringe wells were not drilled until the rest of the field was abandoned very little gas would be left in the reservoir and there would be no marketing facilities available therefor; that about 99% of the gas produced in the Guymon-Hugoton field is transported out of the state of Oklahoma; that the land owner who owns a quarter section of land gets approximately $1 per day on the average well royalty; that the field as a whole is producing more gas than it did five years ago but the individual wells are producing less; that gas of the same quality is sold by different producers in this field at prices varying from the 7¢ minimum now in effect to 9.95781¢; that none of the mineral owners were consulted as to the price they would receive for their gas and that they are dissatisfied with the prices they are receiving and want a uniform price throughout the field; that since 1946 there has been a tremendous increase in the demand for natural gas as a fuel and the costs of production have likewise materially increased; that since the 7¢ minimum was fixed several contracts for gas have been negotiated at a price of 9.8¢ per thousand cubic feet; that to protect the interest of the State of Oklahoma a price for gas in Oklahoma should be fixed which would produce the maximum revenue consistent with the policy of maintaining the markets; that a price of 9.8262¢ would not affect the market, would allow thin acreage to be developed and produced preventing migration and allowing full development of the field, thus protecting the correlative rights of the owners.

Over the objection of other producer respondents in the hearing Phillips Petroleum

Company was allowed to introduce evidence which reasonably tends to show that in the Guymon-Hugoton field it is primarily a producer of gas from its own wells and leases; that it does not sell its gas at the wellhead but, under commitment of long term contracts with Michigan-Wisconsin Pipeline Company and Panhandle Eastern Pipeline Company it gathers the gas which it produces in its own gathering lines, moves the gas to its two processing plants, one in Hansford County and the other in Sherman County, Texas, about a mile and a quarter south of the Oklahoma line, and there removes liquid hydrocarbons and delivers the dry or residue gas to said companies; that in addition to the gas which it produces Phillips has contracts with certain other producers by which it purchases gas at their wellheads which gas it gathers, processes, and sells in the same manner as the gas from its own wells and leases; that the production from its own leases is 14% of the total production of the field and the gas it purchases is 4.4% of the field total, making a total of gas which it produces or purchases of 18.4% of the field total; that the geographical location of the processing plants across the state line is a mere incident, they being so located because the site is more centrally located in respect to Phillips' gathering operations in both Texas and Oklahoma; that the value of the liquid hydrocarbons extracted from the raw gas by Phillips in these plants varies with market conditions as does the cost of gathering the gas; that in the process of gathering and extraction some of the gas is used for fuel purposes and some is lost through shrinkage; that after allowing depreciation to date Phillips has invested in the Hansford and Sherman plants and the gathering systems serving them in excess of 19 million dollars; that all of the gas produced and purchased by Phillips in this field is sold after the extraction of liquid hydrocarbons as residue gas elsewhere than at the wellhead; that the acreage from which it produces and purchases gas is dedicated for the life of the production to the

performance of its contracts with Panhandle and Michigan-Wisconsin; that after processing at these plants at Hansford and Sherman the residue gas is delivered into the interstate pipelines of these two companies; that the contracts with both Panhandle and Michigan-Wisconsin provide in great detail as to how the gas shall be processed and the constituents and heat energy content of the residue gas delivered to them; that besides Phillips only Panoma and Plains Natural Gas Company produce, gather, and process their own gas in this field and sell it in interstate commerce; that Phillips is the only company in the field that both buys gas at the wellhead for processing in addition to processing its own gas; that the gathering and processing of the gas produced in Oklahoma is part of one continuous overall production; that the value of the products extracted from the gas in Oklahoma from this field, although a fluctuating figure, about equals the cost of gathering and the cost of processing; that in order for Phillips to obtain the equivalent of 9.8262 cents per thousand cubic feet at the wellhead for the gas which it produces it must receive 9.8262 cents for the residue gas after processing; that if Phillips does not obtain such price for residue gas but is forced to sell it at the price called for by its contracts with Panhandle and Michigan-Wisconsin such a loss would result that Phillips would be forced to close down its producing, gathering, and processing operations; that there is no other market for this gas; that if Phillips were forced to construct another processing plant inside the borders of Oklahoma the unit cost would be much higher than it is under the present arrangement whereby the same plants can process both Oklahoma and Texas gas; that the total cost of gathering and processing when deducted from the value received for the liquid hydrocarbons extracted leaves only a minute fraction of a cent for earning rate on the investment; that out of 1000 wells currently producing in this field gas is sold at the wellhead from only 141 of them

and the remaining gas produced in this field by all companies is sold at points elsewhere than at the wellhead.

Cities Service Gas Company, Northern Natural Gas Company, and Natural Gas Company introduced stipulations outlining their respective operations and showing that they purchased both raw gas at the wellhead and processed gas and sold most of such gas in interstate commerce. The various contracts and amendments or modifications thereof between Phillips, Panhandle Eastern, and Michigan-Wisconsin were introduced in evidence.

The Commission entered its findings to the effect that since the date of its last order in 1947 fixing the minimum price of gas at the wellhead at 7 cents commodity prices in general and the use value of gas had so increased that the sale of gas from said field at any price less than 9.8262 cents measured at the wellhead at a pressure base of 14.65 pounds absolute per square inch causes both physical and economic waste; that the taking of gas at the price now prevalent causes a less return to royalty owners and the State of Oklahoma, results in inequitable taking from the common source of supply and in discrimination against various producers in the field; that only a small portion of the gas produced in the field is actually sold at the wellhead; that much of the gas is gathered and liquid hydrocarbons extracted, the residue being sold at the conclusion of processing; that the value received by the processor for the liquid hydrocarbons extracted does not exceed the cost of gathering and processing the gas and represents a valuable service to the purchaser; that to realize a price equivalent to and not less than 9.8262 cents per thousand cubic feet at the wellhead such producer and processor must receive for such residue gas a price of not less than 9.8262 cents; that to prevent waste, to protect correlative rights, and insure the greatest ultimate recovery of gas from the common reservoir gas should not be permitted to be taken from the structures of said field at a price less than 9.8262 cents; that a minimum price order cannot be made fully effective un-less the manner in which producers of processed gas shall obtain such price is provided; and entered its order that no gas shall be produced from said field at a price less than 9.8262 cents per thousand cubic feet if sold at the wellhead or on the lease or drilling unit or a price equivalent to 9.8262 cents if sold off the lease or drilling unit or otherwise utilized; that the minimum price of gas sold at the conclusion of gathering but without extraction of hydrocarbons shall be 9.8262 cents plus the reasonable cost of gathering; and that processed or residue gas shall be sold at a price of not less than 9.8262 cents.

The contentions of the various plaintiffs in error may be broadly grouped under three general propositions, each with several subheads and arguments which will be discussed in their proper place. These three propositions are: (1) that the order of the Commission is not predicated upon adequate findings and is not supported by the evidence; (2) that the order purports to regulate interstate commerce and imposes an unlawful embargo and restriction thereon; (3) the Commission has no power or authority, express or implied, to fix the minimum price at which residue gas, only one of the constituents of raw gas, shall be sold.

Under the first general proposition plaintiffs in error allege that the findings of the Commission are inadequate as basic findings of fact to support the conclusions expressed in the order as findings in that the Commission's finding as to the existence of physical waste is a final conclusion, not a basic fact finding; that the finding of physical waste is not supported by the evidence; that the finding of economic waste is not supported by the evidence; that the Commission cannot fix the price of commodity sold in interstate commerce merely to increase the profits of the sellers of such commodity; that the findings that under existing price there is loss to the royalty owners and the State do not justify the order; the order goes beyond the necessities of the case; the finding that the price now prevalent results in inequitable taking from the common source

of supply is without support of adequate findings and evidence; the finding that the prevalent price results in discrimination against various producers is unsupported by findings of basic facts and the evidence; the finding that the production of gas is in excess of market demand is without foundation in findings of basic facts or the evidence; a mere finding that the order is for the prevention of waste, the protection of correlative rights, and in the interest of the state is not sufficient basis for the exercise of jurisdiction; the order purports to fix the earnings of gatherers and processors of gas which is beyond the scope of the Commission's jurisdiction; the order is a special order; there is no substantial evidence to sustain the finding that the minimum price for residue gas should be identical with the wellhead price for raw natural gas.

A review of the evidence outlined above demonstrates that none of these contentions are well founded. There is substantial evidence to the effect that the prevalent price of raw gas in this field (seven cents per thousand cubic feet as fixed by previous order) will not, under present economic conditions prevailing, such as cost of labor and materials, permit the drilling of wells in fringe areas, resulting in non-development of the field, migration of gas to wells in production to the loss of landowners in fringe areas, and incomplete exhaustion of the gas-bearing structures, all to the loss of landowners, producers, and the State of Oklahoma generally. Such facts constitute both physical and economic waste and amply justify the Commission's order on that factor. Certainly such facts clearly show inequitable taking from the common source of supply, irreparable harm to correlative rights of owners, loss to royalty owners, and loss to the state and are sufficient to sustain the interest of the state in correcting such abuses. This is a regulatory order based upon the interest of the State in conserving its natural resources; it is not an order designed merely to increase the earning of producers and processors. Such an order is a proper exercise of the

state's police power. Cities Service Gas Co. v. Peerless Oil & Gas Co., 203 Okl. 35, 220 P.2d 279, affirmed 340 U.S. 179, 71 S.Ct. 215, 95 L.Ed. 190. That it may have such effect is a mere incident.

The evidence that the value of the liquid hydrocarbons extracted just about balances the cost of gathering and processing the raw gas is uncontradicted. Certainly such processing constitutes a valuable service to the purchaser. The contracts introduced in evidence are very precise as to exactly what constituents shall remain in the residue gas contracted for. To have any regulation at all, to insure that all gas produced from the structures in this field shall be sold at the same minimum price it was necessary to fix the price of residue gas and the evidence is substantial to show that such price must be the same as that of raw gas to attain this end. See Phillips Petroleum Co. v. Oklahoma, 340 U.S. 190, 71 S.Ct. 221, 95 L.Ed. 204.

The findings of the Commission are supported by basic facts and the order of the Commission is based on substantial evidence.

Under the second and third broad groups of contentions plaintiffs in error claim that the order fixing the price of residue gas places a burden upon interstate commerce; that such residue gas is dedicated and destined for interstate movement even before the production of the natural gas of which such residue gas is a constituent; that there is a steady, uninterrupted flow from the wells to the gathering system through the processing plant into the pipeline systems and ending at markets in states outside Oklahoma; that such order was not made in any economic interest but for the interest of those producers who also process gas before delivery, and thus imposes an embargo and unlawful regulation on interstate commerce, is arbitrary and discriminatory; the order constitutes an unwarranted and unnecessary invasion of property rights under the guise of the exercise of the police power and deprives plaintiffs in error of their property without due process of law; the order impairs

the obligation of contracts, takes plaintiffs in error's property for private use; there is no local interest which outweighs the national interest in burdening gas sold interstate with state price-fixing regulations; the Commission seeks by this order to exercise extraterritorial jurisdiction; the price fixed for residue gas is not supported by substantial evidence.

■ The order of the Commission fixing a price of 7 cents per thousand cubic feet at the wellhead in the Guymon-Hugoton field was involved in the cases of Cities Service Gas Co. v. Peerless Oil & Gas Co., supra; Phillips Petroleum Co. v. Oklahoma, supra, and Natural Gas Pipe Line Co. of America v. Panoma Corporation, Okl. Sup., 271 P.2d 354. The same field and the same parties as here were involved and the same arguments were made and the same authorities cited in support thereof as here. These cases are decisive of the point that the Commission under its regulatory power for conservation purposes has the power to fix a minimum price as a condition precedent to the taking of natural gas from the structures; that such minimum price does not place an embargo or unlawful restriction upon interstate commerce, unlawfully impair the obligations of contracts, or violate due process. And as said in the Phillips Petroleum Co. case, supra, by the United States Supreme Court, the Commission may order a producer such as Phillips who does not sell raw gas at the wellhead to obtain the equivalent of the fixed minimum price when the gas is sold after processing, because the Commission must be able to regulate the operations of all producers or there is little point in regulating any.

■ The only new question presented here is: may the Commission establish a method or formula by which it can be ascertained whether a producer who does not sell raw gas at the wellhead obtains the equivalent of the fixed minimum price of raw gas as taken from the structures? and if so and to implement the obtaining of such equivalent price can the Commission add to the cost of raw gas which is not processed before sale but is sold off the lease the reasonable cost of gathering, or in case the raw gas is processed for the removal of liquid hydrocarbons before actual delivery to the purchaser, fix the price of the residue gas being only one constituent of the raw gas, so delivered?

Appellants concede that under their contracts the residue gas which they purchase is dedicated to the fullfillment of such contracts even before the production of the natural gas of which such residue gas is a constituent is produced and that such gas can be sold to no one else. This, of course, amounts to a sale of the residue gas in place; the sale is made before any movement of any kind starts and before anything in the nature of interstate commerce occurs, regardless of the acts required to be performed before the residue gas is separated from other constituents of the raw gas and regardless of the point of delivery to the purchaser. As said in Natural Gas Pipe Line Co. of America v. Panoma Corporation, supra, the processing of the raw gas amounts to a manufacturing operation and represents a valuable service to the purchaser. Under their contracts purchasers are able to buy a manufactured product for which they have a ready sale without necessitating large investment in processing equipment to make the raw product salable.

It seems self-evident and axiomatic that if the Commission has the power to regulate by fixing minimum prices it has the power to establish a formula and method by which it may be ascertained and determined whether all producers in the field are obtaining such minimum price, as it is their inescapable duty to do. It is only necessary that a formula or method so established be reasonable and practically effective to carry out the purpose for which it is made. Under the evidence here it is clearly shown that the market for liquid hydrocarbons is a competitive and fluctuating one. It would seem highly impractical to attempt to fix a price for any one or all of such liquid hydrocarbons. It is also shown that by the very nature of natural gas its market is fixed and stable and amounts almost to a monopoly in a limited way; that because of the great expense and in-

vestment necessary for adequate distributing lines for moving the gas to the ultimate user a seller of residue gas must have a dedicated and guaranteed source of supply and franchise for more or less exclusive sale. Such requirements, of course, keep the sale of residue natural gas as a fuel off a competitive market to a great extent.

The evidence shows that the average return over a long period from the sale of the liquid hydrocarbons extracted from the raw gas just about balances the cost of gathering and processing; sometimes the sale amounts to more and quite often amounts to less. As a practical matter it seems that the only feasible method to carry out the purpose of the Commission in regulating the taking of natural gas from the structures by all producers, regardless of their particular mode of operation, would be to fix the price of the residue gas, which is the only fairly stable constituent of raw gas.

All parties concede that under the cases cited above the Commission can fix the price of gas as taken from the structure. If it can fix the price of the whole it can fix the price of all of the parts constituting the whole. If it is not practically feasible to fix the price of all the parts constituting the whole it can fix the price of that constituent which can be controlled, provided it does it in a reasonable manner and so that the overall purpose is carried out. Under the evidence it seems that the Commission established the only formula which it could establish that would be workable and not be discriminatory or arbitrary. Under the formula established the producer who sells raw gas without processing off the lease obtains the minimum price plus the reasonable cost of gathering; mere arithmetical computation shows that only by adding the cost of gathering to the minimum price can such a producer obtain the equivalent of such minimum price at the wellhead. The same thing is true as to residue gas. As it is shown that the liquid hydrocarbons counterbalance the cost of gathering and processing (which as above stated represents a valuable service to the purchaser) the only practical way to ensure that a producer who processes raw gas before actual delivery thereof to the purchaser will obtain the equivalent price of raw gas at the wellhead is to fix the price of residue gas as the same price of raw gas. As a practical matter this allows the purchaser of residue gas to receive a manufactured and processed product for which he has a sale at the same price he would have to pay for the raw product. If, for example, a furniture dealer could obtain finished furniture for sale at the same price he could obtain unfinished lumber he would think he had a rare bargain. The point of delivery of the finished product is a mere incident. The sale is made before anything in the nature of interstate commerce occurs. The order thus has no extraterritorial effect.

We think the Commission has the power to fix the price of residue gas as a necessary incident, under the facts shown in this record, to the regulation of the sale of raw gas as taken from the structures, and the formula and method established is both reasonable and practical.

The order of the Commission is based upon basic findings of fact and is supported by substantial evidence.

Affirmed.

JOHNSON, V. C. J., and WELCH and CORN, JJ., concur.

WILLIAMS, J., concurs by reason of stare decisis.

HALLEY, C. J., and DAVISON, O'NEAL and BLACKBIRD, JJ., dissent.

BLACKBIRD, Justice (dissenting).

I cannot agree with the views expressed in the majority opinion.

The price-fixing part of the Order involved herein is as follows:

"It Is Therefore Ordered by the Corporation Commission of the State of Oklahoma as follows:

"1. That no gas shall be produced from any well located in the Guymon-Hugoton Field of Oklahoma except at a price of not less than 9.8262¢ per thousand cubic feet if sold at the wellhead or on the lease or drilling unit

from which produced, *or a price equivalent to not less than 9.8262¢ per thousand cubic feet at the wellhead if sold off the lease or drilling unit or otherwise utilized. If the gas is sold during or upon conclusion of gathering without being processed for the extraction of liquid hydrocarbons, the price shall be not less than 9.8262¢ per thousand cubic foot plus the reasonable cost of gathering. If the gas is processed for extraction of liquid hydrocarbons and sold during or at the conclusion of gathering, the price for the residue gas shall be not less than 9.8262¢ per thousand cubic feet."* (Emphasis added.)

It will be seen from the above that the Order purports to fix the price of gas at three different stages, namely:

(1) Raw gas at the wellhead;

(2) Raw gas "sold off the lease or drilling unit or otherwise utilized" including that sold at the conclusion of gathering and before processing, and

(3) Residue gas (the residue of raw gas *after* it has been processed).

As to (1) above, there can be no question as to the validity and constitutionality of the Order in view of the decision of this Court in Cities Service Gas Co. v. Peerless Oil & Gas Co., 203 Okl. 35, 220 P.2d 279, and the decision of the United States Supreme Court on that case's appeal. See Cities Service Gas Co. v. Peerless Oil & Gas Co., 340 U.S. 179, 71 S.Ct. 215, 95 L.Ed. 190. However, as to (2) and (3) I think the Order is invalid and unconstitutional.

Each of the respondent companies is a "Natural Gas Company" as that term is defined in the Natural Gas Act, 52 Statutes 821, 15 U.S.C.A. § 717 et seq. All are foreign corporations operating gas pipe line transportation systems traversing state lines and transporting residue gas derived by processing raw gas. Substantially all of this residue gas is transported through Respondents' interstate pipe lines and sold as fuel in various northern states. Such gas transportation is performed under authority of certificates of public convenience and necessity issued to said Re-

spondents by the Federal Power Commission and the selling of that gas in those states is likewise under the exclusive jurisdiction of that body. When the raw gas arrives at Phillips' two Texas plants for processing, it has already been commingled in Phillips' Texas-Oklahoma pipe line system with other raw gas produced in Texas. Michigan-Wisconsin's purchases from Phillips are made under a contract specifying a certain price therefor, entered into by and between said parties on December 11, 1945, with amendments later made.

The Panhandle Company's pipe line system extends directly from producing areas in Oklahoma, Texas and Kansas to Missouri and other states north and east, where the gas it transports is sold at wholesale, both to utility companies for resale and to industries in those states for their own use. Part of this gas is derived from Panhandle's own wells in Oklahoma, and part is purchased from other producers.

All of the respondents maintain that Order No. 26096 is an unconstitutional assertion of power by the Corporation Commission in so far as it purports to fix the price of residue gas, and raw gas, after it has left the wellhead and lease or drilling unit where it is produced and enters an interstate pipe line system for resale in other states. Only Natural argues that the Order as a whole, including the part applicable to wellhead gas, is invalid or not justified by the evidence. As I consider the Order separable as applied to the gas in its three classifications above named, and, as I note that under the stipulated facts, Natural is not a purchaser of wellhead or raw gas, if Order No. 26096 had been reversed only as it purports to apply to gas other than at the wellhead, Natural would then have no rights impinged, as the price it is paying Panoma for residue gas under its present contract presumably would not be directly affected or disturbed. In that situation, the questions Natural raises as to the wellhead gas price fixing feature of the Order would become merely abstract or hypothetical ones, and not subject to review on specifications of error by this party not shown to be then affected by it. See Patterson v. Stanolind Oil & Gas

Co., 182 Okl. 155, 77 P.2d 83; Emrick v. State Highway Commission, 147 Okl. 252, 296 P. 412; Swan v. Home Savings & State Bank, 148 Okl. 42, 297 P. 250; In re Stewart Bros., 53 Okl. 153, 155 P. 1124; 2 Am.Jur., "Appeal and Error", § 152. I will therefore reserve opinion on that part of Natural's argument and consider now only its argument directed at the "non-wellhead" portions of the Order, together with those of the other protestants, which on those phases are substantially the same.

As the order purports to fix the price of raw gas at the conclusion of its gathering beyond Oklahoma's territorial limits, or after it has gotten into an interstate pipe line, and purports to fix the price of residue gas, respondents say:

(1). The findings and Order of the Commission are not supported by substantial, competent evidence;

(2). The Order is beyond the constitutional and statutory power of the Commission and, as applied to protestants, violates,

(a) Sections 7, 15, 23, and 24 of Article II of the Oklahoma Constitution, and Section 10, Article I, and the Fourteenth Amendment of the U. S. Constitution, by taking their property and valuable property rights without due process of law, without just compensation, and without a justifying public purpose or reciprocity of advantage, and denies them equal protection of the law,

(b) and violates Section 8, Article I of the U. S. Constitution by placing an unlawful embargo on interstate commerce.

In so far as Order No. 26096 purports to apply to the gas after it is received into interstate pipe lines and is sold for immediate transportation and resale in other states, I think its invalidity is settled by State of Wisconsin v. Federal Power Commission, 92 U.S.App.D.C. 284, 205 F.2d 706. The opinion promulgated therein demonstrates, with the ample support of the previous U. S. Supreme Court decisions cited therein, that gas sales, in no respect (affecting their interstate character) different from those in the present case, are interstate commerce, and cannot be regulated by any state; and that the exemption of "production or gathering of gas" contained in the Natural Gas Act, supra, does not extend to sales made after production and gathering have been completed. There is no direct conflict between this decision and previous decisions of our own Court. There is little, if any, disagreement among the litigants herein as to the principles of constitutional law that apply. The only conflict or joinder of issues in their argument seems to center around their divergent interpretations of Order No. 26096. Thus they agree that under the weight of authority, including Cities Service Oil & Gas Co. v. Peerless Oil & Gas Co., supra, extension of the state's police power to price-fixing can be constitutionally justified only on the basis of a public purpose or protection of the public interest, such as gas conservation. But proponents of the Order seek to interpret and justify it as a conservation measure. Therefore, let us analyze the present order as tested by the principles laid down by our Court in the Cities Service Gas Co. case. [203 Okl. 35, 220 P.2d 280] The material ones, as expressed in the syllabus of our opinion, are as follows:

"1. The grant of power to the Corporation Commission under 52 O.S. 1941, § 239 to regulate the *taking of natural gas from a common source of supply* 'so as to prevent waste, protect the interest of the public, and of all those having a right to produce therefrom,' by necessary implication includes the power to employ such means as may be *reasonably necessary* to the accomplishment of the declared purposes and includes the power to fix a price consideration in the *taking* of gas when found necessary to the attainment of such ends.

"2. The provisions of 52 O.S. 1941, § 233, give the Corporation Commission authority to fix the price at which natural gas may be *produced and taken from the field,* under the circumstances and in the manner therein stated.

"3. Price control, like any other form of regulation, is unconstitutional only if arbitrary, discriminatory, or

demonstrably irrelevant to the policy which the Legislature is free to adopt, and hence an *unnecessary and unwarranted interference with individual liberty*. A price fixing order of the Corporation Commission made pursuant to statute is to be tested by the same standards.

\* \* \* \* \* \*

"5. The Commerce clause of the Federal Constitution does not preclude the state in the protection of local interests from fixing a uniform minimum price consideration *as a condition of the taking* of natural gas from a common reservoir because a producer therefrom will in the normal course of business sell and deliver gas in interstate commerce. The regulation is imposed *before* the operation of interstate commerce occurs." (Emphasis added.)

As shown in the above quotation, our upholding of the gas price-fixing Order involved in that case, was based, at least in part, upon the following consideration:

(1) That the Order was a *reasonably necessary* means to the accomplishment of the declared purpose of the Corporation Commission's statutory grant of power to prevent waste and protect correlative rights in a common source of gas supply;

(2) That price control is unconstitutional only when it is an *unnecessary and unwarranted* interference with individual liberty;

(3) That such an order does not violate the Commerce Clause of the Federal Constitution when it fixes a uniform minimum price as a condition of *taking the gas from a common reservoir* and takes effect *before* the gas gets into interstate commerce.

When weighed in the light of the above tests, I think the order in question must be found wanting. After examining the provisions of the Order purporting to fix the price of residue and raw gas away from the well or field or at the conclusion of its gathering, and weighing their effect and operation, as applied to the situation here and the rights of all concerned, I do not see how they can be justified as a conservation measure. In the 14th paragraph of its findings, the Commission found:

"That a minimum price order cannot be made fully effective and discrimination prevented without a means provided for determining the manner in which the amount realized for gas by producers operating gathering and processing plants."

This is obviously an incomplete sentence and finding, but if it was intended to say by it that fixing a price for residue gas and raw gas away from the well or field is reasonably necessary to the effective and indiscriminate operation of the order, I do not agree. It was not shown that any of the wells in the Guymon-Hugoton Field are without gauges at their wellheads or that it is necessary to fix the price at any other point in order to accomplish the only legally justifiable purposes of such an order. There is no substantial evidence in this case to detract from the conclusion that the purposes of conservation are served when the taking from the gas sand is regulated at the wellhead by fixing the price right there—and before it gets into interstate pipe lines and is commingled with gas from other states, as was shown to occur before some of it arrives at Phillips' plants in Texas. Of course, Phillips' evidence was calculated to show that it and other gatherers and processors similarly situated had a problem of determining whether or not they were receiving for residue gas the equivalent of the Commission-fixed price for raw gas at the wellhead. This same problem is said to have been presented to the United States Supreme Court in Phillips Petroleum Co. v. Oklahoma, 340 U.S. 190, 71 S.Ct. 221, 222, 95 L.Ed. 204, as evidenced by the following excerpt from that Court's opinion:

"Phillips also relies heavily on the contention that the orders are unreasonably vague. In substance, this argument is nothing more than that the determination by an integrated company of proceeds realized from gas at the wellhead involves complicated prob-

lems in cost accounting. These problems are common to a host of valid regulations. There is nothing to indicate that Phillips will be penalized for reasonable and good faith efforts to solve them."

In both of the above cases and the Cities Service Gas Co. case, supra, it was demonstrated that an order fixing a wellhead price applies to all and discriminates against none. While this may not be the only way to prevent waste and preserve correlative rights by price-fixing, it appears to be the best plan that has come before this court. Contrary to the impression the majority opinion seems to leave, the Phillips' case, supra, furnishes it no support. While it is true that the Court therein recognized that the Commission must be able to fix the price for all *producers* or there is no point in trying to fix the price for any, it rejected Phillips' claim that a wellhead price could not be uniformly and indiscriminately enforced. And it must be borne in mind that the Orders there involved attempted no more than to fix the price of raw gas at the wellhead, as distinguished from a residue or by-product processed *in another state and there* sold in interstate commerce. It was specifically stated in that opinion: "Appellant does not argue that the orders violate the Commerce Clause, art. 1, § 8, cl. 3."

The price fixed in the objectionable portions of the order here presented would not operate indiscriminately. True, the order might readily solve Phillips' accounting problems. If completely effective, it might even furnish Phillips legal justification and exoneration for not living up to its contracts for the sale of residue gas made in prior years and specifying prices which now may seem unfavorable to it; yet it would discriminate against those who do not have the pipe line and processing facilities Phillips possesses. Granted that residue gas, or raw gas with gasoline and hydrocarbons removed, is more valuable for fuel purposes and to fuel consumers and distributors than the gas as it comes from the well in its natural state and that such gas should command a better price from such purchasers (being processed and ready for their use)

these facts are immaterial, or at least of minor or secondary importance, to the primary question: Is it necessary for the Commission to guarantee to a processor its cost of gathering, or in the instance of residue gas, that cost, plus the cost of processing, in order to accomplish conservation of the State's natural gas resources? If so, this was not established by the evidence despite the statement to the contrary contained in the majority opinion. No attempt was made to show that gas from the Guymon-Hugoton Field would not have a market or that economic or physical waste of such resource would result if gatherers of gas in the field were not thus guaranteed their cost of gathering over and above the wellhead price. In this connection, I challenge any and all to show me proof in the present record that Phillips is actually losing money on its operations, or (as said in the majority opinion) "that if Phillips does not obtain" the price fixed by the order in question "for residue gas but is forced to sell it at the price called for by its contracts with Panhandle and Michigan-Wisconsin such a loss would result that Phillips would be forced to close down its producing, gathering, and processing operations; * * *". As hereinbefore noted, Phillips attempted to show by its interdepartmental system of cost accounting, and the Commission found, that the "value" of the liquid hydrocarbons extracted from the raw gas does not exceed the cost of processing and gathering it, "including a reasonable allowance for depreciation and return on investment * * *." But I say that even if, on the basis of applicable law and substantial evidence, such a guaranteed profit to such processors might conceivably be justified as a conservation measure, it is discriminatory, and the discrimination is in favor of those situated as is Phillips. By guaranteeing such companies the same minimum price for residue gas as raw or wellhead gas, the order gives them either: *one* highly marketable product (residue gas) free of cost for gathering and processing (if such cost is charged to its processing or refining department), or *more* marketable products free of such costs, such as gasoline, carbon black and other hydrocarbons (if the gathering and processing is charged

against the residue gas as a part of the cost of marketing it). Other purchasers buying gas at the wellhead would not have the advantage of this "two-way guarantee," but after purchasing the gas there, are "on their own" as regards paying their costs of gathering and marketing it. Another and second discrimination which is more patent on the face of the Order is that it purports to require the producer or lessee who sells gas after it is "gathered", but before it is processed, to obtain for it, in addition to the wellhead (and residue price) of 9,8262 cents per thousand, an extra added premium which the Order calls: "the reasonable cost of gathering." Aside from the controversies such an order will engender over the question of when or at what point gas can be said to be "gathered" within the meaning of that term as used in the order, this provision discriminates in favor of those owners of mineral rights who derive their producing royalty income from lessees or producers who sell gas at the conclusion of gathering, and against those who derive their income from producers in the other two catagories, that is, (1) Those who sell nothing but raw gas at the wellhead, and (2) Those who make no sale of gas until after it is processed and becomes residue gas. The majority opinion reflects that there is some wastage and shrinkage between the wellhead and the gauges at the processing plants. How will the royalty owners under leases owned by Phillips get paid for as many cubic feet of gas as the royalty owner under leases producing gas that is sold at the wellhead? Will these royalty owners get paid on the basis of the number of cubic feet of raw gas that pass through the gauges at the wellhead, or will they be paid on the basis of the number of feet of residue gas that pass through the gauges at the processing plant? To me, the above considerations not only demonstrate that the order in question is discriminatory in more than one respect, but also, that by it, the Commission is about to launch an unlawful and dangerous invasion of the field of private enterprise, or "individual liberty", as expressed in the Cities Service Gas Co. case, supra, without the justification of necessity for conservation purposes. If this Body's fixing of the price of residue gas can be justified on the grounds of conservation, as different a product and as far removed as it is from the natural gas that is the resource to be conserved, then I see no reason why that Body cannot also fix the price of gasoline, carbon black, and other products or commodities refined and/or manufactured from natural gas.

The record reveals that before the last of the protracted series of hearings in this case the Commission, through its Chairman and its attorney, expressed grave doubt, or at least serious misgivings, as to whether a price-fixing order for anything but raw gas at the wellhead could be legally or constitutionally justified as a conservation measure. This makes it doubly surprising and somewhat imponderable to find that after delaying its decision several days after the last hearing, the Commission, on the basis of the weak and biased evidence presented by no other company than Phillips, signed substantially the same kind and form of order that Phillips' attorneys had previously drawn and exhibited to the Commission earlier in the hearings.

On the basis of the foregoing views, it is my conclusion that Order No. 26096 is valid in so far as it sets a price for natural gas at the wellhead, but is invalid in its other price-fixing aspects. Accordingly, I think the Order should have been affirmed in part and reversed in part. To that extent, and for the foregoing reasons, I dissent to the opinion of the majority.